14 P.3d 752 (2000)
142 Wash.2d 568
The STATE of Washington, Respondent,
v.
Timothy Dennis CRONIN, Appellant.
The State of Washington, Respondent,
v.
Linh Ngoc Bui, Appellant.
Nos. 69043-0, 69050-2.
Supreme Court of Washington, En Banc.
Argued May 16, 2000.
Decided December 14, 2000.
*753 Suzanne Lee Elliott, Seattle, Nielsen, Broman & Assoc., David Bruce Koch, Seattle, for Appellant.
Norm Maleng, King County Prosecutor, Lee Yates, Deputy, James Whisman, Deputy, Cynthia Gannett, Deputy, Seattle, for Respondent.
ALEXANDER, J.
We granted direct review of judgments of the King County Superior Court in two separate cases, State v. Bui and State v. Cronin. The principal and only common issue that is presented in the consolidated appeal of these cases is whether the jury in each case was provided with a correct instruction on the law regarding accomplice liability. For reasons stated herein, we conclude that the instructions were defective and not harmless in either case. Consequently, Bui's conviction for first degree assault and Cronin's conviction for aggravated murder in the first degree are reversed. Cronin's conviction for first degree felony murder, not being affected by the erroneous jury instruction, is affirmed.

I. FACTS

State v. Bui
Linh Ngoc Bui associated with a Seattle gang known as the "Viet Boys" (VB). Br. of Resp't at 5.[1] On April 6, 1996, Bui and *754 several members of that gang ventured into Seattle's "International District" for a night of "cruising." The gang members rode in two automobiles, a Honda driven by Bui and a Blazer driven by Senh Tang. While engaged in "cruising," the VBs happened upon two other cars occupied by members of another gang, the "Young Oriental Troop" (YOT). As the vehicles of the respective gangs passed each other, one of the YOTs appeared to flash a "gang sign."[2] Immediately thereafter, a passenger in Bui's Honda yelled out "FOLLOW THEM." 7 Verbatim Report of Proceedings (VRP) at 42. Bui complied. Tang followed suit and joined Bui in following the YOT cars.
As the driver of the leading YOT car pulled his vehicle to a stop at an intersection, Bui maneuvered his car so that it blocked the other car's passage. Tang then pulled in behind Bui. At this point a VB gang member exited from each VB car. The young men who exited the cars, Hung Van Nguyen and Lam Giang, then proceeded to open fire on the YOT car that was stopped. That car escaped without injury to any occupants. Passengers in the second YOT car were not, however, as fortunate. As that car approached the intersection at which the VB cars were located, Nguyen and Giang again opened fire. As a result, two YOT members were struck with bullets. This activity caused the second YOT car to quickly speed past the VB shooters who continued firing as the car made its getaway. After the incident, Bui and Tang transported their passengers to a home where some of the VBs lived.
Bui, Nguyen, Tang, and Giang were each charged with one count of "Assault in the First Degree" with the allegation that they used "firearms and deadly weapons" in the commission of the offense. Clerk's Papers (CP) at 1. The State offered to recommend reduced sentences for Bui and Tang in exchange for their testimony at trial. Bui rejected the offer.[3] The State then amended the information to charge Bui and Nguyen with two additional counts of "Assault in the First Degree" with an allegation that they used "firearms and deadly weapons" in the commission of the offense. CP at 8. Bui and Ngyuen proceeded to trial with Nguyen.[4]
At the conclusion of all the testimony, the trial judge instructed the jury as follows:
A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing a crime.
CP at 87 (jury instruction 10). Bui's counsel objected to this instruction, arguing that in order for accomplice liability to attach, the defendant must know the general nature of the specific crime that the principal intends to commit. Br. of Appellant at 17.
During closing arguments, the prosecutor proffered this explanation of accomplice liability:
[A]N ACCOMPLICE IS A PERSON WHO IS AN ACCOMPLICE IF HE ENCOURAGES OR AIDS ANOTHER PERSON IN COMMITTING A CRIME WITH KNOWLEDGE THAT WILL PROMOTE OR FACILITATE THE COMMISSION OF A CRIME. DOES THE STATE HAVE TO PROVE THAT LINH BUI KNEW THAT THE PERSON IN HIS CAR WOULD GET OUT AND SHOOT? NO. IT'S THE COMMISSION OF A CRIME.
DID LINH BUI KNOW BY HIS ACTIONS WHEN HE CHASED AFTER ANOTHER CAR, WHEN HE PULLED ACROSS IN FRONT OF THEM AND *755 BLOCKED THEM OFF IN AN INTERSECTION, ALLOWED HIS PASSENGERS TO GET OUT, DOES COMMON SENSE SHOW US THAT HE KNEW HE WAS FACILITATING THE COMMISSION OF A CRIME? HARASSMENT? PHYSICAL ASSAULT? ANY CRIME.
9 VRP at 26-27 (emphasis added). Bui's counsel objected to this portion of the prosecutor's argument and asked the trial court to instruct the jury that a defendant's intent to harass could not satisfy the knowledge requirement and thus could not trigger accomplice liability for first degree assault. The trial judge declined to give the additional instruction.
During its deliberations the jury submitted the following question to the trial judge:
Accomplice liability
# 10 states "in the commission of a crime["]
To be an accomplice to first degree assault, does he need to have knowledge that he is assisting in a first degree assault or that he is promoting a crime of any kind.
CP at 14. The trial judge responded to the inquiry:
The defendant does not need to know the specific crime (1st ° assault) that will occur but must know the general nature of the crime that will occur[.]
CP at 14.
The jury found Bui and Nguyen guilty of all three counts of first degree assault, finding that they each used a "deadly weapon" in the commission of the offenses. CP at 16. At sentencing, Bui moved to dismiss the charges, arguing that there was insufficient evidence that he knew an assault was going to be committed. The trial court denied his motion but acknowledged that the record was "essentially silent" on the issue of whether Bui knew there would be a shooting. The trial court imposed an exceptional sentence for the underlying assault convictions of no time in prison and imposed a 60-month firearm enhancement sentence on each of the three convictions, ordering the sentences to run consecutively. Thus, Bui received a 180-month sentence.

State v. Cronin
On May 3, 1994, Timothy Cronin and fellow inmate Michael Roberts escaped from a minimum-security prison in Mission, British Columbia, Canada. The two men crossed the Canadian border into the United States and proceeded to embark on a crime spree in this state and the state of Oregon. Their criminal endeavors came to an end when they were arrested after robbing a health food store in Salem, Oregon. Cronin and Roberts were apprehended in their get-away vehiclea gray Chevrolet Blazer that was registered to Mr. Eli Cantu of King County, Washington.
After telephone attempts to contact Cantu were unsuccessful, Oregon authorities contacted the King County police and asked them to visit Cantu's residence in Edmonds in order to determine if Cronin and Roberts had stolen Cantu's vehicle. Upon entering Cantu's flat, the police officers found his lifeless body tied to a chair. A pool of blood, apparently caused by a fatal stab wound, lay beneath his body This finding prompted two King County detectives to travel to Salem to speak with Cronin about Cantu's death. The detectives gave Cronin his Miranda[5] warnings and then proceeded to take a tape-recorded statement from him after he indicated he understood his rights and was willing to make a statement.
The State subsequently charged Cronin in King County Superior Court with felony murder in the first degree and, in the alternative, premeditated first degree murder with alleged aggravating circumstances that the murder was committed: (1) to conceal the commission of a crime or to protect or conceal the identity of the perpetrator, and (2) in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree.[6]
*756 During a CrR 3.5[7] hearing regarding the admissibility of the statement Cronin gave to King County detectives, the deputy prosecuting attorney told the trial court that "[i]t's our anticipation at this point that we do not and will not be using Mr. Cronin's statement in our case in chief, but we do want to have the opportunity to use it to rebut Mr. Cronin should he take the stand[.]" VRP at 4. After hearing testimony from the King County detectives that interviewed Cronin shortly after his arrest, the trial court ruled that Cronin's statement "would be admissible if offered by the state in their case in chief" and that the statement could be used for "cross examination or rebuttal purposes." VRP at 39.
After the trial commenced, the State decided to introduce Cronin's statement in its case in chief. The State acknowledged that initially it had not intended to use Cronin's statement in its case in chief, but reconsidered its decision after Cronin's counsel suggested in his opening statement that Cronin "was not present with Roberts at the murder scene," and cross-examined a State's witness to "cast doubt upon his identification of Cronin at the crime scene." Br. of Resp't at 41. Over objection by Cronin's counsel, the trial court concluded that the statement would be admitted.
In his statement to the detectives, Cronin conceded that he had escaped from prison with Roberts and, that together with Roberts, he paid a visit to Cantu, a person whom Cronin described as Roberts's friend. Essentially, Cronin claimed that Roberts asked Cantu if it would be possible for Cantu to help them by letting Roberts and Cronin "tie up" Cantu and take his vehicle so that it would appear that Cantu was not an accessory. Cantu, according to Cronin, was initially reluctant but relented after Cronin said to Cantu, "just let us at least tie you up and we're gone, we're out of here." According to Cronin, Roberts ordered Cronin to help him tie Cantu to a chair and together they bound Cantu's hands. Cronin said that he then watched as Roberts fastened Cantu to the chair and put tape over Cantu's mouth. Cronin said that he and Roberts then moved Cantu into a hallway where he could not be seen or heard. Cronin indicated that Cantu "was fine" at that point. Cronin informed the detectives that he took Cantu's wallet and keys to Cantu's Chevrolet Blazer, and turned it around so that Roberts and he could depart. According to Cronin, Roberts appeared agitated after they drove away from Cantu's home. Eventually, Roberts informed Cronin that Cantu was dead and said, "I signed it the same way I did my last one."[8] Cronin told the detectives he was frightened at that time, indicating that he had no idea that Roberts was going to kill Cantu. Ex. 221.
The State proffered two theories for Cronin's guilt for the murder of Cantu. One theory was that the evidence showed that Cronin was the actual killer of Cantu and that, therefore, he was guilty of premeditated murder. The other theory was that he was an accomplice to Roberts who committed the premeditated murder of Cantu.
Cronin asked the trial court to instruct the jury that in order for the jury to find him guilty as an accomplice to premeditated murder, it must find that he shared "the same intent or mental state possessed by the principal with reference to the crime charged ." The trial court declined to give Cronin's proposed instruction and, instead, instructed the jury as follows:
A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he either:

*757 (1) solicits, commands, encourages or requests another person to commit the crime; or
(2) aids or agrees to aid another person in committing a crime.
CP at 206(jury instruction 7).
During closing arguments, the deputy prosecutor contended that Cronin was guilty of premeditated murder as an accomplice and explained the "theory" behind accomplice liability:
A person who is an accomplice to a crime is guilty of that crime. We've all heard the phrase "in for a penny, in for a pound," "in for a dime, in for a dollar." This is the principle, this is the policy underlying accomplice-liability.
VRP at 3998. The deputy prosecutor went on to state that in order for Cronin to be held accountable for premeditated murder, Cronin merely needed to aid or agree to aid:
in the commission of the assaultive behavior that unravels into that fatal stabbing.
VRP at 3999.
Cronin's counsel disputed the State's explanation of accomplice liability and contended that Cronin's statement indicated that he did not know that Roberts was going to kill Cantu and, indeed, did not help plan the killing. Counsel claimed, further, that Cronin was not present when Roberts killed Cantu and was not apprised of the killing until after it occurred. He contended, therefore, that Cronin could not be found guilty as an accomplice to "Aggravated Murder in the First Degree." CP at 268.
The jury found Cronin guilty of felony murder in the first degree and premeditated murder with one aggravating factor.[9] By special interrogatory the jury found that Cronin did not "personally act with a premeditated intent to cause the death of Elijio Cantu." CP at 219. Cronin was sentenced to life imprisonment without the possibility of parole. CP at 171.[10]

II. DISCUSSION

A. Accomplice Liability Instruction
Bui and Cronin both assert that the jury instruction relating to accomplice liability that was given to the jury at their respective trials was an incorrect statement of the law. They each contend that the accomplice liability instruction allowed the jury to find them guilty of a crime committed by another person if it found they had general knowledge that their actions would promote "a crime." It is their position that under our state's complicity statute, RCW 9A.08.020, a person is not culpable as an accomplice unless that person possesses general knowledge of the specific crime with which he or she is eventually charged. The State counters that the instruction, which Bui and Cronin assail, is modeled on WPIC 10.51. Washington Pattern Jury Instructions: Criminal (2d 1994). It submits that it is an accurate statement of the law on accomplice liability because, in its view, accomplice liability attaches so long as the defendant knows that he or she is aiding in the commission of any crime. The question before us then is whether a putative accomplice can be found guilty of the crime charged for merely acting with knowledge that his or her actions would promote or facilitate "any crime."
We recently dealt with this precise issue in State v. Roberts, 142 Wash.2d 471, 14 P.3d 713 (2000). As we indicated there, the plain language of the complicity statute does not support the State's argument that accomplice liability attaches so long as the defendant knows that he or she is aiding in the commission of any crime. On the contrary, the statutory language requires that the putative accomplice must have acted with knowledge that his or her conduct would promote or facilitate the crime for which he or she is eventually charged. We also noted in Roberts that the legislative history of *758 RCW 9A.08.020 supports a conclusion that the legislature "intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has `knowledge[.]' "Roberts, 14 P.3d 735, at 736. Finally, we observed that the pertinent case law from this court supports imposing criminal liability on an alleged accomplice only so long as that individual has general knowledge of "`the crime'" for which he or she was eventually charged. Id. at 736 (citing State v. Rice, 102 Wash.2d 120, 125, 683 P.2d 199 (1984) and State v. Davis, 101 Wash.2d 654, 682 P.2d 883 (1984)).
We adhere to our decision in Roberts and conclude here, as we did in that case, that the fact that a purported accomplice knows that the principal intends to commit "`a crime'" does not necessarily mean that accomplice liability attaches for any and all offenses ultimately committed by the principal. See Roberts, 14 P.3d at 736. In our judgment, in order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating the crime for which that individual was eventually charged. Because the jury instruction which was given in the Bui and Cronin trials permitted the jury to find accomplice liability on an incorrect legal basis, they were legally deficient. The fact that the instruction was modeled on a Washington pattern instruction for a criminal case does not alter our conclusion.
The State contends that even if the jury instruction that was given in the Bui and Cronin trials is legally incorrect, any error that resulted therefrom was harmless. Suppl. Br. of Resp't at 8. Bui and Cronin both assert that the erroneous instruction was not harmless and that their convictions should, therefore, be reversed.
In addressing the harmless error issue, we first observe that the State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. See In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); State v. Acosta, 101 Wash.2d 612, 615, 683 P.2d 1069 (1984); State v. McCullum, 98 Wash.2d 484, 493-94, 656 P.2d 1064 (1983); State v. Green, 94 Wash.2d 216, 224, 616 P.2d 628 (1980). We also note that a conviction cannot stand if the jury was instructed in a manner that would relieve the State of this burden. State v. Jackson, 137 Wash.2d 712, 727, 976 P.2d 1229 (1999) (noting that "`[t]he State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. It is reversible error to instruct the jury in a manner that would relieve the State of this burden.'" (quoting State v. Byrd, 125 Wash.2d 707, 713-14, 887 P.2d 396 (1995))). With these precepts in mind, we turn to the question of whether the instructional error in these cases can be labeled harmless.

1. State v. Bui

In order to prove that Bui was an accomplice, the State had to show that Bui possessed general knowledge that he was aiding in the commission of the crime of assault. See Rice, 102 Wash.2d at 125, 683 P.2d 199 (citing Davis, 101 Wash.2d 654, 682 P.2d 883). As we have observed above, the jury instruction given to the jury departed from the accomplice liability statute and essentially allowed the jury to convict Bui as an accomplice if it found that he knew his actions would promote or facilitate "a crime." Indeed the prosecutor implored the jury to return a verdict of guilty if it found that Bui had facilitated any crime. 9 VRP at 26. Because the instruction relieved the State from meeting its burden of proving beyond a reasonable doubt that Bui knew that he was facilitating the crime of assault, the error cannot be said to be benign. See Jackson, 137 Wash.2d at 723, 976 P.2d 1229.
Moreover, we do not agree with the State that the prejudicial effect of the erroneous instruction in question was mitigated by the judge's attempt to "clarify" the instruction. As noted above, the jury inquired, during its deliberations, as to whether Bui had to know "that he is assisting in a first degree assault or that he is promoting a crime of any kind." CP at 14. The judge responded to the inquiry by telling the jury that Bui needed to know "the general nature of the crime that will occur[.]" Id. It is not particularly clear to us what the trial court meant by that *759 statement. We are concerned that the reference to "general nature of the crime" would imply to the jury that Bui could be deemed an accomplice merely if he knew he was facilitating a verbal exchange between the VBs and YOTs. On the other hand, it is possible that the jury could have concluded that the "general nature of the crime" meant that it had to find that Bui was aware that he was facilitating a physical confrontation between the two gangs. In short, it is simply not clear to us that the trial court's effort to clarify the incorrect instructions mitigated the harmful effect of the instructional error.
In sum, we are satisfied that the jury instruction may have allowed the State to secure a conviction without having to prove beyond a reasonable doubt that Bui knew he was facilitating the commission of the crime of assault. Alleviating the State of this burden cannot be said to be error that is harmless.

2. State v. Cronin

In order to establish that Cronin committed premeditated first degree murder, the State had to prove that Cronin either (1) acted with premeditated intent and murdered Cantu or (2) had general knowledge that his confederate, Michael Roberts, would murder Cantu. Based on the jury's answer to the special interrogatory, to the effect that Cronin did not "personally act with a premeditated intent to cause the death of Eli Cantu," it is apparent that Cronin's conviction for premeditated first degree murder hinged on accomplice liability. In order to convict Cronin as an accomplice to premeditated murder, the State had to prove beyond a reasonable doubt that Cronin had general knowledge that he was aiding in the commission of the crime of murder. See Rice, 102 Wash.2d at 125, 683 P.2d 199 (citing Davis, 101 Wash.2d 654, 682 P.2d 883). As noted above, the accomplice liability instruction that was given to the jury allowed it to convict Cronin of premeditated murder merely if it found that he knew he promoted or facilitated "the commission of a crime." See CP at 206. Because the instruction relieved the State of the burden of having to prove beyond a reasonable doubt that Cronin knew he was facilitating the crime of murder, the instructional error cannot be deemed harmless.

B. Other Issues
Although we have concluded that there was an instructional error that justifies a new trial for Bui on all of his convictions and a new trial for Cronin on his first degree murder conviction, it is necessary for us to briefly discuss two other issues that may resurface during Bui's retrial. Cronin also raises an additional issue that relates to the validity of both of his convictions. Although we have concluded that the instructional error affected his first degree murder conviction, we are satisfied it did not affect his conviction for first degree felony murder. Thus, it is necessary for us to discuss this additional issue raised by Cronin.

1. State v. Bui

a. Testimony of June Kansap
Bui contends that the trial court abused its discretion by allowing his girl friend, June Kansap, to testify, over his counsel's objections, that she heard what she believed was a gunshot at the Jackson Street house several hours before the shooting. Br. of Appellant at 37. The State responds that the trial court has broad discretion in admitting testimony at trial and that it did not abuse its discretion in allowing Kansap's testimony.
At trial, Kansap testified that approximately four hours before the shooting occurred, Bui picked her up in his car in Bellevue and drove her to the house where some of the VBs lived. Kansap went on to say that about 30 minutes after their arrival at the house she heard what sounded like fighting between people in the back part of the house and then heard what she thought was "THE SOUND OF THE GUN SHOT." 5 VRP at 31. She told the jury that Bui looked "SCARED" by what they had heard. 5 VRP at 32. She testified that Bui then took her home to Bellevue. During the deputy prosecutor's closing argument, he made the following comments about Kansap's testimony:

*760 WELL, WHAT IS INTERESTING ABOUT [KANSAP'S] STATEMENT IS THAT IT'S CLEAR THAT LINH BUI KNOWS THAT THESE PEOPLE HAVE GUNS IN THE HOUSE. AND IT'S CLEAR THE OTHER PEOPLE HAVE GUNS, KNOW THERE ARE GUNS IN THE HOUSE. THIS ISN'T A BIG SURPRISE THAT PEOPLE SUDDENLY JUMP OUT OF THESE CARS AND STARTED SHOOTING.

9 VRP at 31(emphasis added).
Bui alleges that Kansap's testimony had no relevance on the issue of whether he had knowledge that he was facilitating the commission of an assault when he blocked the YOT car. He claims, additionally, that even if the testimony has some relevance on that issue, its prejudicial effect substantially outweighs any probative value it may have.
We are satisfied that the trial court did not err in concluding that Kansap's testimony was relevant.[11] We reach that conclusion because if Kansap's testimony were believed by the jury, it would tend to make the existence of a fact, i.e., whether Bui knew that one of the VBs possessed a gun at the time of the assault, slightly more probable. See State v. Ferreira, 69 Wash.App. 465, 471, 850 P.2d 541 (1993) (noting that evidence showing that coparticipant had a gun earlier in the day made it reasonable to conclude he had it in his possession later in the day). Moreover, we do not see how the probative value of Kansap's testimony was outweighed by the danger that it would unfairly prejudice Bui. "`[U]nfair prejudice' is that which is more likely to arouse an emotional response than a rational decision by the jury." State v. Gould, 58 Wash.App. 175, 183, 791 P.2d 569 (1990). Within its context, "unfair prejudice" means an undue tendency to suggest a decision on an improper basis commonly an emotional one. State v. Cameron, 100 Wash.2d 520, 529, 674 P.2d 650 (1983).
Bui asserts that Kansap's testimony was "highly inflammatory" and allowed the State to make the "unfair suggestion" that Bui "knew that someone in his group had a gun and intended to commit an assault." Br. of Appellant at 38-39. We reject this argument. Although Kansap's testimony may have been beneficial to the State's case, nothing in her testimony appears to have had the capacity to inflame the jury or numb its sense of reason or logic. We do not believe, therefore, that the trial court abused its discretion in allowing Kansap to testify as to what she heard a few hours before the shooting occurred.

b. Consecutive Sentencing
Bui also asserts that the trial court erred when it ruled that RCW 9.94A.310(3)(e) mandates that the three firearm enhancement sentences were to be run consecutively. We are not inclined to discuss this issue because it may not be an issue on retrial. In the event the issue should resurface, we believe that our recent decision in In re Post Sentencing Review of Charles, 135 Wash.2d 239, 955 P.2d 798 (1998), provides the trial court with the necessary guidance in interpreting RCW 9.94A.310. See also In re Personal Restraint of Greening, 141 Wash.2d 687, 694, 9 P.3d 206 (2000).

2. State v. Cronin

Cronin argues that the trial court erred in allowing the State, in its case in chief, to play to the jury the tape-recorded statement Cronin gave to the King County detectives. Cronin contends that this was error because the State "stipulated" it would not use the statement other than for the purpose of impeaching Cronin if he testified at trial.[12]
We review a trial court's evidentiary rulings under the abuse of discretion standard. See State v. Myers, 133 Wash.2d 26, 34, 941 P.2d 1102 (1997). An evidentiary ruling will remain undisturbed by this court unless we find that the trial court's ruling is based on untenable grounds or was made for *761 untenable reasons. See State v. Norlin, 134 Wash.2d 570, 576, 951 P.2d 1131 (1998).
Cronin asserts that the prosecution entered into the functional equivalent of a "pretrial stipulation" at the confession hearing held pursuant to CrR 3.5 when it stated it would not use the statement other than for impeachment purposes. In our judgment, the trial court did not act in a manifestly unreasonable fashion when it ruled that the State could play Cronin's recorded statement for the jury's consideration. We say that because, after reviewing the record, we are satisfied that the State did not stipulate that it would not use Cronin's statement in its case in chief. The record reflects, rather, that the deputy prosecutor informed the trial court that "[i]t's our anticipation at this point that we do not and will not be using Mr. Cronin's statement in our case in chief." VRP at 4 (emphasis added). We have previously observed that:
Generally, a stipulation is an agreement between the parties to which there must be mutual assent. Furthermore, to be effective, the terms of a stipulation must be definite and certain.
State v. Parra, 122 Wash.2d 590, 601, 859 P.2d 1231(1993) (citations omitted) (citing 73 Am.Jur.2d Stipulations § 2(1974)). The equivocal statement made by the State at the CrR 3.5 hearing does not qualify as a "definite and certain" statement. Consequently, we do not believe that the trial court abused its discretion in allowing the State to present Cronin's statement in its case in chief.

III. CONCLUSION
In conclusion, we hold that the trial court's jury instruction regarding accomplice liability in both State v. Bui and State v. Cronin was legally deficient. We also hold that the instructional error was not harmless in either case. We conclude, therefore, that Bui's convictions for first degree assault are reversed. We also reverse Cronin's conviction for premeditated first degree murder for the same reason. Finally, we conclude that because Cronin's first degree felony murder conviction was unaffected by the instructional error, a point Cronin concedes, his felony murder conviction should be affirmed.
SMITH, JOHNSON, MADSEN, and SANDERS, JJ., concur.
TALMADGE, J. (dissenting).
I dissent because WPIC 10.51 accurately instructs a jury on the law of accomplice liability in Washington. 11 Washington Pattern Jury Instructions: Criminal (WPIC) (2d ed.1994). The majority's newfound interpretation of RCW 9A.08.020(3) and WPIC 10.51 disrupts and distorts clear Washington law on accomplice liability. Accomplices need not share the same mens rea. So long as accomplices act with the general knowledge they will promote or facilitate a crime, they are jointly responsible for any reasonably foreseeable criminal conduct engendered by their confederacy. I would, therefore, affirm the convictions of Linh Ngoc Bui and Timothy Cronin.
The majority today approaches the interpretation of RCW 9A.08.020(3)[1] and WPIC 10.51[2] as if our former cases on the issue of accomplice liability never existed. Beginning with State v. Davis, 101 Wash.2d 654, 682 P.2d 883 (1984), and leading to State v. Sweet, 138 Wash.2d 466, 980 P.2d 1223 (1999), we have held an accomplice, having knowingly agreed to participate in a criminal act, runs the risk of having a confederate exceed the scope of the initial criminal understanding; the accomplice is, nevertheless, culpable for the reasonably foreseeable consequences of that initial criminal understanding.
*762 In Davis, we upheld the conviction of the defendant for robbery in the first degree for acting as a lookout while his confederate robbed a pharmacy; the defendant claimed he did not know his confederate was armed so he could not be an accomplice to the crime of robbery. We disagreed stating:
The issue presented by this case involves the interrelationship between [the robbery and accomplice] statutes. Specifically, the question requires a determination of whether the accomplice liability statute predicates criminal liability on general knowledge of a crime of specific knowledge of the elements of the participant's crime, i.e., possession of a gun.
. . . .
... As to the substantive crime, the law has long recognized that an accomplice, having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality.
Davis, 101 Wash.2d at 657-58, 682 P.2d 883. Of critical importance is the dissent by Justice Pearson who articulated a view of RCW 9A.08.020(3) the majority now adopts:
The Legislature has, in effect, said that a person is an accomplice to a crime (first degree robbery) only if he acts with the knowledge that it will promote or facilitate the commission of the crime for which he is charged (first degree robbery). The phrase "the crime" is modified by the phrase "a crime". The Legislature did not say that an accomplice need only possess the knowledge that his conduct would promote the commission of "any crime"; it chose to require a more specific mental state, by using the phrase "the crime".
101 Wash.2d at 662, 682 P.2d 883.
In State v. Guloy, 104 Wash.2d 412, 431, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986), we held an accomplice need not share or even have knowledge of a principal's premeditation to be guilty of murder in the first degree; the State did not have to prove Guloy intended to murder the victim.
Similarly, in State v. Hoffman, 116 Wash.2d 51, 804 P.2d 577 (1991), we again reiterated the view that accomplices need not share the same mental state to be guilty:
Other decisions have similarly addressed this issue and have similarly concluded that the accomplice liability statute predicates criminal liability on general knowledge of the crime and not on specific knowledge of the elements of the participant's crime. Accomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation.
116 Wash.2d at 104, 804 P.2d 577 (footnote omitted).
Finally, in our recent decision in Sweet, the defendant and his confederate Robert Slaton appeared at the house of Sweet's aunt. Sweet hid in the back of Slaton's truck. Slaton administered a brutal beating to Sweet's aunt and the two burglarized her house. Sweet was convicted of assault, burglary, and conspiracy to commit burglary. We upheld Sweet's conviction for assault, stating:
Petitioner Sweet claims he was not in the Schuh residence and thus could not be held responsible for the burglary and assault. Even assuming the jury might have believed he did not enter the house, it is not necessary for him to have been in the Schuh residence on August 30, 1995 to be charged with and convicted of first-degree burglary and assault because he was charged as an accomplice and the trial court instructed the jury on accomplice liability. The accomplice liability instruction allowed the jury to convict Petitioner Sweet as a principal even if he did not enter the Schuh residence on the day the burglary and assault were committed. It is sufficient for Petitioner to have done "something in association with the principal to accomplish the crime." It is sufficient for an accomplice to have general knowledge of a crime. It is not necessary for an accomplice to have specific knowledge of every element of the principal's crime.
Sweet, 138 Wash.2d at 479, 980 P.2d 1223 (footnotes omitted). There was nothing in the Sweet decision remotely implying Sweet and Slaton agreed to assault Sweet's aunt. *763 There, we noted with approval the holding in Davis. Id. at n. 68.
In addition to our own case law on this issue, the Court of Appeals has repeatedly upheld accomplice liability where the accomplice had general knowledge his or her confederate would commit a crime; the accomplices need not share the mens rea of the crime and, in fact, need not have specific knowledge of all of the elements of the crime actually committed. See, e.g., State v. Johnston, 100 Wash.App. 126, 996 P.2d 629 (2000); State v. Haack, 88 Wash.App. 423, 958 P.2d 1001 (1997), review denied, 134 Wash.2d 1016, 958 P.2d 314 (1998); State v. Ferreira, 69 Wash.App. 465, 850 P.2d 541 (1993); State v. Hinds, 85 Wash.App. 474, 936 P.2d 1135 (1997); State v. Galisia, 63 Wash.App. 833, 822 P.2d 303, review denied, 119 Wash.2d 1003, 832 P.2d 487 (1992); State v. Peterson, 54 Wash.App. 75, 772 P.2d 513, review denied, 113 Wash.2d 1007, 779 P.2d 727 (1989); State v. Randle, 47 Wash.App. 232, 734 P.2d 51 (1987), review denied, 110 Wash.2d 1008 (1988); State v. Bockman, 37 Wash.App. 474, 682 P.2d 925, review denied, 102 Wash.2d 1002 (1984).
Counsel for Cronin makes a strong argument that the legislative history of RCW 9A.08.020(3) compels the view now espoused by the majority here: the accomplice must act with the knowledge he or she is promoting or facilitating the specific crime for which he or she is charged. Were this a case of first impression in the interpretation of the statute, this might be a telling argument. But this is decidedly not a case of first impression. The long line of Washington cases cited above have become a part of Washington law as set forth in WPIC 10.51.
Under our statutory interpretive principles, judicial construction of a statute becomes a part of the statute as if it were part of the statute from its enactment. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 137, 937 P.2d 154, 943 P.2d 1358 (1997); State v. Regan, 97 Wash.2d 47, 51-52, 640 P.2d 725 (1982). Thus, our decisions in Davis, Guloy, Hoffman, and Sweet and the numerous other cases have become part of the interpretation of RCW 9A.08.020(3). These decisions simply cannot be reconciled with the majority's analysis. The majority pays little heed to principles of stare decisis. The majority does not demonstrate any affirmative harm flowing from our prior decisions of accomplice liability justifying its precipitous departure from existing law. See generally In re Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970).
The majority indicates our decisional law may be inconsistent with RCW 9A.08.020(3). Majority at 757. But the glaring flaw in the majority's analysis is the doctrine of acquiescence. Davis was decided in 1984. For sixteen years, no legislative action has followed to overturn our interpretation of the statute there. The Legislature is obviously satisfied with our oft-repeated formulation of accomplice liability, acquiescing in our statutory interpretation. Soproni v. Polygon Apartment Partners, 137 Wash.2d 319, 327 n. 3, 971 P.2d 500 (1999); McKinney v. State, 134 Wash.2d 388, 403, 950 P.2d 461 (1998); Manor v. Nestle Food Co., 131 Wash.2d 439, 445 n. 2, 932 P.2d 628, 945 P.2d 1119 (1997); State v. Coe, 109 Wash.2d 832, 846, 750 P.2d 208 (1988); Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 789, 719 P.2d 531 (1986).
Moreover, the majority's decision is bad public policy. Under the majority analysis, for example, if A and B agree to burglarize a home, and B shoots the home's resident, A will not be an accomplice to the homicide. It is plainly foreseeable that burglars may encounter residents in the home in the course of a burglary, and they should be culpable for any harm exacted by a confederate on such residents. See, e.g., State v. Carothers, 84 Wash.2d 256, 525 P.2d 731 (1974). The majority will afford criminals a new safe haven, allowing them the opportunity to parse their criminal behavior. When criminals agree to commit criminal conduct they should be held accountable for their participation and face the full consequences for their behavior:
The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, *764 or aids in some other way, he is a participant. The elements of the crime remain the same.
Carothers, 84 Wash.2d at 264, 525 P.2d 731.
Finally, the majority opinion represents a departure from the settled law of Davis. We cannot be oblivious to the practical implication of the majority's decision: innumerable personal restraint petitions will likely flow from the majority's new understanding of accomplice liability.
Cronin and Bui agreed to participate in criminal activities. When they broke the law, they must take the consequences of their decision. Rather than disturb well-settled law on accomplice liability, I would affirm the Bui and Cronin convictions.
GUY, C.J., IRELAND and BRIDGE, JJ., concur.
NOTES
[1] The evidence disclosed that Bui was not an actual member of the gang but, rather, was an "associate" who spent time with gang members.
[2] Flashing a gang sign involves some type of gesture or hand movement that signifies gang affiliation. 4 Verbatim Report of Proceedings (VRP) at 30-31.
[3] Tang agreed to testify for the State and pleaded guilty to a reduced charge of rendering criminal assistance.
[4] The record does not reflect if Giang was ever tried for first degree assault.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Roberts was tried separately and convicted of aggravated first degree murder and sentenced to death. We reversed his first degree murder conviction, vacated the sentence of death and remanded for retrial. State v. Roberts, 142 Wash.2d 471, 14 P.3d 713 (2000).
[7] CrR 3.5(a) states, in relevant part, that: "When a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing, if not previously held, for the purpose of determining whether the statement is admissible."
[8] Roberts had been serving a sentence for murder.
[9] The jury did not find that the murder was committed to conceal the commission of a crime or to protect or conceal the identity of a person committing a crime. It did, however, find that the murder was committed in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree.
[10] At sentencing, the trial court determined that the felony murder charge merged with the aggravated first degree murder charge. CP at 169.
[11] "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.
[12] Cronin did not testify at trial.
[1] A person is an accomplice of another person in the commission of a crime if:

(a) With knowledge that it will promote or facilitate the commission of the crime, he
(i) solicits, commands, encourages, or requests such other person to commit it; or
(ii) aids or agrees to aid such other person in planning or committing it....
[2] A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing a crime.