IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37988-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| VERNAL GEORGE GARVEY, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Vernal Garvey appeals his convictions for robbery in the first degree, possession of stolen property, and bail jumping. He contends that the prosecuting attorney committed misconduct at least four times during the closing statement. We disagree and affirm his convictions.

## FACTS

This prosecution arises from the robbery of Harrison Nichols by a companion of defendant, Vernal Garvey. We lift our facts from trial testimony.

Moriah Whittaker, an acquaintance of Harrison Nichols, was implicated in the robbery. In mid-October 2017, Whittaker lost her job and expressed worry to Nichols about losing her apartment. On November 4, Whittaker received a "three-day pay or

vacate" notice. She could not afford to pay the rent by the deadline. Report of Proceedings (RP) (June 26, 2019) at 425-26. Whittaker demanded that Nichols pay her rent money in exchange for a prior, two-week stay in her apartment. Nichols refused Whittaker's demand.

Moriah Whittaker and Vernal Garvey engaged in an intimate relationship. The two lived in the same apartment with Alison and Jonta'h Wesley. Victim Harrison Nichols mingled with Garvey on eight occasions. Garvey knew Nichols' PIN number to his debit card, based on Garvey's previous use of the card. Whittaker and Wesley did not know Nichols' PIN.

Vernal Garvey conceived of a plan to steal from Harrison Nichols. Moriah Whittaker believed Nichols to be an easy target. Under Garvey's plan, Whittaker would ask Nichols for his debit card to purchase cigarettes, since Nichols was under eighteen years old. Whittaker would then convey the card to Garvey and Jonta'h Wesley.

Moriah Whittaker contacted Harrison Nichols on November 4, 2017 in order to execute the scheme to steal Nichols' debit card. Whittaker apologized for taking Nichols for granted and asked to meet in person. The two first planned for Whittaker to retrieve Nichols from his work and then talk in Whittaker's vehicle.

Before the meeting of Moriah Whittaker and Harrison Nichols, the latter purchased cigarettes. Nichols' early purchase of cigarettes foiled the trio's initial plan. At some unidentified time, Whittaker learned that Nichols already purchased the

2

cigarettes.

According to Moriah Whittaker, Vernal Garvey devised a new plan, while Jonta'h Wesley averred that Whittaker conceived of a second plan. The trio's new plan required Whittaker to convince Harrison Nichols to meet her in a nearby park. Vernal Garvey planned to commit what would appear to be a random robbery there. Before meeting Nichols, Whittaker drove Garvey and Jonta'h Wesley to the park. When she left the duo at the park, Garvey carried two firearms. According to Jonta'h Wesley, Garvey handed him a firearm and said: "'Use the gun.'" RP (June 25, 2019) at 351. Wesley maintained that he believed he could not refuse Garvey's direction.

When Moriah Whittaker retrieved Harrison Nichols from his employment, she suggested that the two smoke at a nearby park. Nichols refused and proposed that they smoke in a veterinary clinic parking lot close to a McDonald's restaurant. The duo parked in the nearby lot and smoked marijuana.

While Harrison Nichols and Moriah Whittaker reposed in Whittaker's car, Jonta'h Wesley entered the right rear passenger seat of the automobile. Nichols recognized Wesley, because Wesley, Vernal Garvey, and a female associate drove Nichols to work two or three weeks before the November 4 robbery. Wesley leveled a gun to Nichols' head and demanded that Nichols surrender his possessions. Nichols complied and handed Wesley his backpack containing a marijuana pipe, $80 cash, his cellphone, and his debit card. Wesley bolted from Whittaker's car. Wesley claimed that he did not

3

threaten to shoot Nichols. Vernal Garvey hid in bushes across the street during the robbery.

A Safeway grocery store's surveillance footage taken on the night of November 4 showed Jonta'h Wesley and another male, later identified as Vernal Garvey, toting a backpack inside the store after the theft of Harrison Nichols' possessions. The backpack matched the description of Nichols' stolen backpack. The surveillance video showed Garvey removing Nichols' debit card from the backpack. Garvey then unsuccessfully attempted to use the card to withdraw money from an ATM. The Safeway security footage subsequently showed Wesley and Garvey changing their clothes and exiting the grocery store.

After the theft of Harrison Nichols' personal property, Moriah Whittaker drove Nichols to the McDonald's restaurant, where Nichols worked. Nichols called law enforcement from the restaurant. Lacey Patrol Officer Jocelyn Uria responded at 9:48 p.m. Nichols suggested to Officer Uria the involvement of his companion, Whittaker, in the robbery. According to Nichols, Whittaker's rent was late, and she knew that Nichols possessed $1,000.

Officer Jocelyn Uria interviewed Moriah Whittaker. Whittaker denied that she knew Jonta'h Wesley and denied any involvement in the robbery. The fact that the gunman did not utter any demands or threats toward Whittaker seemed suspicious to Uria. During this time, Whittaker texted Vernal Garvey: "'Hey, I'm stuck talking to

them [law enforcement].'" Garvey responded, "Delete all the messages." RP (June 25, 2019) at 287.

Officer Jocelyn Uria watched the Safeway surveillance footage. She did not recognize either of the men shown in the video. She prepared a flier that posted photos of each male, and she distributed the flier among law enforcement.

Harold Nichols later used a tracking application from a computer to determine the locations where his robber took his phone. The application registered the phone as having been at the Safeway store.

The Lacey Police Department assigned the robbery case to Officer Jessie Hadley to investigate. On November 7, 2017, Officer Hadley visited Moriah Whittaker's apartment in Olympia. On arriving at the apartment, he saw a male standing on Whittaker's balcony. Hadley recognized the individual from Officer Jocelyn Uria's flier. He called for assistance before approaching Whittaker.

On the arrival of additional officers, law enforcement knocked on Moriah Whittaker's door. Whittaker answered the door and identified herself. When Whittaker opened the door, a male stood behind her. Officer Jessie Hadley recognized this second man as one of the suspects depicted in Officer Uria's flier, but he concluded that the man was not the same person he earlier saw standing on the balcony. Officer Hadley eventually identified the man standing behind Whittaker as Vernal Garvey.

Moriah Whittaker and Vernal Garvey went to the Lacey Police Department headquarters to speak with law enforcement. During an interview with Whittaker, Officer Jessie Hadley warned her that officers had already started "to connect the dots." RP (June 26, 2019) at 420. Officer Hadley also informed her that law enforcement officers possessed a flier of the potential suspects, both of whom he spotted in Whittaker's apartment. Whittaker then adjusted her narrative and confessed to her involvement in the robbery of Harrison Nichols.

Based on Moriah Whittaker's statement, Officer Jessie Hadley detained Vernal Garvey. Officer Hadley released Whittaker so that she could help locate Jonta'h Wesley. Whittaker later met with Wesley and informed police of his whereabouts. Officer Hadley detained Wesley and interviewed the suspect. Wesley admitted to taking Harrison Nichols' backpack and giving it to Garvey, but denied using a firearm during the crime. After Wesley gave his statement, law enforcement arrested him.

Officer Jessie Hadley presented a photo lineup to Harrison Nichols, which lineup included photos of Vernal Garvey and Jonta'h Wesley. Nichols identified both men. He pinpointed Wesley as the gunman.

Law enforcement executed a search warrant for Moriah Whittaker's apartment and the car she drove on the night of the robbery. In the nightstand by Whittaker's bed, police found a black .22 caliber handgun. In Whittaker's vehicle, next to the driver's seat, officers found a second firearm, a .9 mm handgun. At trial, Whittaker averred that

both handguns belonged to Vernal Garvey. Whittaker testified that Jonta'h Wesley used the firearms during the robbery.

While in custody, Jonta'h Wesley and Vernal Garvey shared a cell block. Garvey frequently came to Wesley's cell, although Wesley does not recall anything said by Garvey. Wesley understood that Garvey violated a no contact order by speaking to him, but he did not report Garvey. In exchange for reduced charges of second degree robbery and felony harassment, Wesley pled guilty.

PROCEDURE

The State of Washington charged Vernal Garvey, by second amended information, with one count each of robbery in the first degree while armed with a firearm, possessing stolen property in the second degree, bail jumping, and intimidating a witness. Before closing arguments, the State moved to dismiss the intimidating a witness charge. The trial court dismissed the charge with prejudice.

At trial, Deputy Prosecuting Attorney Joseph Wheeler testified that Vernal Garvey failed to appear for a required hearing following his release on bail. Garvey had received proper notice for the hearing. Garvey's absence formed the basis of Garvey's bail jumping charge.

At the beginning of closing argument, the State's attorney read verbatim the jury instruction on accomplice liability:

> Jury No. 8. It's up here on the screen if you want to follow. The

7

language is "a person is an accomplice in the commission of a crime if with knowledge that it will promote or facilitate the commission of the crime he either . . . solicits, commands, encourages or requests another person to commit the crime, or . . . aids or agrees to aid another person in planning or committing the crime.'

RP (June 27, 2019) at 625.

During closing argument, the prosecuting attorney sometimes referred to the evidence presented and commented that no rebutting evidence existed or that scant evidence supported Vernal Garvey's defense theory:

> *You have evidence of nothing else* except the defendant was in her [Moriah Whittaker's] bedroom with her as a [sic] apartment tenant and that Jonta'h was sleeping on the couch.

RP (June 27, 2019) at 628 (emphasis added). The State's attorney argued about the gun that law enforcement seized in Moriah Whittaker's bedroom:

> It was the bedroom that both the defendant and Moriah shared. And you have evidence from both Harrison and Jonta'h that that's where he [Vernal Garvey] slept. *You have no evidence that Moriah ever possessed that gun, none.* It was in her bedroom in her nightstand exactly where she said the defendant kept it.

RP (June 27, 2019) at 629 (emphasis added).

During closing, the State's counsel addressed Vernal Garvey's knowledge of Harrison Nichols' debit card PIN:

> *But there is no other evidence that's been presented to you* that Harrison did give the defendant his debit card and his PIN number so he could go into the dispensary and legally purchase marijuana. So that's— the defendant is the only person who had that information. *That's the only evidence before you*. Nobody else. He'd never given it to Moriah.

8

Definitely hadn't given it to Jonta'h.

RP (June 27, 2019) at 631 (emphasis added).  As to the gun used in the robbery and the

marijuana Whittaker and Nichols smoked, the prosecuting attorney commented:

> *There is no evidence that's been presented to you* other than the
> firearm that Jonta'h used to rob Harrison Nichols came from the defendant.
> That's the only evidence you have.  "Use it.  You need to pull your weight"
> is what Jonta'h's testimony was.
> . . . .
> *There is no other evidence in front of you* except the defendant
> provided both the gun and the marijuana.

RP (June 27, 2019) at 635-36 (emphasis added).  The State's attorney added:

> So there is no question a robbery occurred.  There is no question.
> And a firearm was used. . . .  That's—there's no evidence to suggest
> anything but that.  That is way beyond a reasonable doubt, ladies and
> gentlemen, because you have everybody testify to it.

RP (June 27, 2019) at 637-38.

During closing statement, the State's counsel emphasized that the State entered no

plea deal with Moriah Whittaker:

> There were no deals from the state prior to her [Moriah Whittaker]
> providing that testimony, ladies and gentlemen.  *There is no evidence to
> suggest anything otherwise to you, none, because there was none.*  That's
> the point.  She gave that statement freely and voluntarily because it was
> time to be honest within three days of the crime.

RP (June 27, 2019) at 640-41 (emphasis added).

The prosecuting attorney commented, during closing, that Vernal Garvey could

not explain why he and Jonta'h Wesley met at Safeway after the alleged robbery:

9

> Jonta'h robs Harrison Nichols November 4th, 2017, about 9:45. There was no question. He runs away and meets up with the defendant at Safeway. Now, this is going to get interesting. *How are they going to explain that?* The defendant just happened to be on a jog at the same time and ran across his buddy at Safeway in November at 9:50? No. Because you saw the video. And we'll show it again. He says "I gave the defendant the backpack. I did my part. I got the backpack." Now gives it to the defendant. *How are they going to explain that?*

RP (June 27, 2019) at 642 (emphasis added). Counsel again referenced Garvey's

knowledge of Harrison Nichols' PIN number:

> He knew. It doesn't matter how he knew. He knew. He was the only one that knew Harrison's PIN number to his debit card, ladies and gentlemen. *There is no other evidence before you than that*.

RP (June 27, 2019) at 648 (emphasis added).

When concluding the closing argument, the State's attorney explained reasonable

doubt and accomplice liability:

> Ladies and gentlemen, I didn't spend a lot of time on reasonable doubt. That's the lawyer's either crutch or stick, reasonable doubt. How hard is it for us to even define reasonable doubt during jury selection? It could be this. It could be that. A doubt for which a reason exists. There is none here. . . . But when you break down to the elements of robbery, when the three are acting in concert, *in for a penny, in for a pound*, you are responsible for what the other person does as long as you're acting in concert. The three were acting in concert all day long and finally stumbled, I would argue, into a plan that was successful in at least getting Harrison's card. It wasn't successful in draining his bank account thankfully, but they finally did what they had set out to do.

RP (June 27, 2019) at 654-55 (emphasis added). Vernal Garvey did not object to any of

the State's closing argument.

10

The jury found Vernal Garvey guilty of robbery in the first degree, possessing stolen property in the second degree, and bail jumping. The jury also found that Garvey, or an accomplice, was armed with a firearm while committing first degree robbery. The trial court sentenced Garvey to 101 months' confinement.

LAW AND ANALYSIS

On appeal, Vernal Garvey challenges numerous comments by the State's attorney during summation. Garvey assigns prosecutorial misconduct to the State's counsel repeatedly mentioning the lack of evidence to rebut the State's evidence, the State's counsel's definition of "reasonable doubt," and the prosecutor's use of the saying "in for a penny, in for a pound."

Burden of Proof and Right to Remain Silent

Vernal Garvey argues that the prosecutor committed misconduct by shifting the burden of proof to him and repeatedly uttering comments that incriminated Garvey for choosing not to testify at trial. The State denies the error and posits that the prosecuting attorney only highlighted the lack of evidence to support Garvey's defense.

The Fourteenth Amendment to the United States Constitution guarantees that "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has interpreted the due process guaranty as requiring the State to prove beyond a reasonable doubt every fact necessary to constitute the charged crime. *In re Winship*, 397 U.S. 358, 364, 90 S.

Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. W.R., Jr.*, 181 Wn.2d 757, 761-62, 336 P.3d

1134 (2014). Stated differently, the State, not the defendant, bears the burden of proving

the elements of the crime beyond a reasonable doubt. *State v. Fleming*, 83 Wn. App. 209,

215, 921 P.2d 1076 (1996).

An accused has a Fifth Amendment right not to testify. *State v. Chervenell*, 99

Wn.2d 309, 312, 662 P.2d 836 (1983). In turn, the State may not employ the accused's

silence against him. *State v. Barry*, 183 Wn.2d 297, 306, 352 P.3d 161 (2015). This

court determines whether a prosecutor improperly comments on a defendant's silence by

considering two factors: (1) whether the prosecutor manifestly intended the remarks to be

a comment on the defendant's exercise of his right not to testify and (2) whether the jury

would naturally and necessarily interpret the statement as a comment on the defendant's

silence. *State v. Barry*, 183 Wn.2d at 307. The prosecutor, however, may state that

certain State's evidence is undenied without reference to who could have denied the

evidence or without comment that the evidence is undisputed. *State v. Sargent*, 40 Wn.

App. 340, 346, 698 P.2d 598 (1985).

> Surely the prosecutor may comment upon the fact that certain testimony is undenied, without reference to who may or may not be in a position to deny it and, if that results in an inference unfavorable to the accused, he must accept the burden, because the choice to testify or not was wholly his.

*State v. Litzenberger*, 140 Wash. 308, 311, 248 P. 799 (1926). The prosecuting

attorney's mere mention that defense evidence is lacking does not constitute prosecutorial

misconduct or shift the burden of proof to the defense. *State v. Jackson*, 150 Wn. App.

877, 885-86, 209 P.3d 553 (2009).

Vernal Garvey challenges the following remarks by the prosecutor and highlights

that only he could have provided the evidence to defeat the State's arguments:

> You have evidence of nothing else except the defendant was in her
> bedroom.

RP (June 27, 2019) at 628.

> You have no evidence that Moriah ever possessed that gun, none.

RP (June 27, 2019) at 629.

> But there is no other evidence that's been presented to you that
> Harrison did give the defendant his debit card and his PIN number.

RP (June 27, 2019) at 631.

> There is no evidence that's been presented to you other than the
> firearm that Jonta'h used to rob Harrison Nichols came from the defendant.

RP (June 27, 2019) at 635.

> There is no other evidence in front of you except the defendant
> provided both the gun and the marijuana.

RP (June 27, 2019) at 636.

> So there is no question a robbery occurred. There is no question.
> And a firearm was used. . . . That's—there's no evidence to suggest
> anything but that.

RP (June 27, 2019) at 638.

> There were no deals from the state prior to her [Moriah Whittaker]
> providing that testimony, ladies and gentlemen. There is no evidence to

suggest anything otherwise to you, none, because there was none.

RP (June 27, 2019) at 640-41.

> Jonta'h robs Harrison Nichols November 4th, 2017, about 9:45.
> There was no question. He runs away and meets up with the defendant at
> Safeway. Now, this is going to get interesting. How are they going to
> explain that?

RP (June 27, 2019) at 642.

> He was the only one that knew Harrison's PIN number to his debit
> card, ladies and gentlemen. *There is no other evidence before you than
> that*.

RP (June 27, 2019) at 648 (emphasis added).

> *A doubt for which a reason exists. There is none here*.

RP (June 27, 2019) at 654 (emphasis added).

Vernal Garvey relies on *State v. Fiallo-Lopez*, 78 Wn. App. 717, 899 P.2d 1294

(1995). In *Fiallo-Lopez*, the State charged defendant Jose Fiallo-Lopez with delivery and

possession of cocaine. During closing argument, the State commented that "there was

'absolutely' no evidence to explain why Fiallo-Lopez was present at the restaurant and at

Safeway precisely when Lima and Cooper were there for the drug transaction or why he

had contact with Lima at both places." *State v. Fiallo-Lopez*, 78 Wn. App. at 729. The

State argued that the defendant never attempted to rebut the prosecution's evidence

regarding his involvement in the drug deal. This court observed that no one other than

Fiallo-Lopez himself could have offered the explanation the State demanded.

14

Accordingly, this court held that the State improperly commented on Fiallo-Lopez's right

not to testify and shifted the burden of proof onto him. This court, nonetheless, ruled that

the prosecutor's error was harmless beyond a reasonable doubt.

We readily distinguish *State v. Fiallo-Lopez* because counsel prosecuting Vernal

Garvey never remarked that Garvey failed to rebut the State's evidence. The State's

attorney consistently stayed within the permissible limits of argument according to *State

v. Jackson*, 150 Wn. App. 877 (2009). Counsel framed the comments in terms of there

being an absence of evidence, without suggesting that Garvey needed to supply that

evidence.

Reasonable Doubt

Vernal Garvey challenges the State's definition of reasonable doubt, "[a] doubt for

which a reason exists." RP (June 27, 2019) at 654. Garvey cites *State v. Kalebaugh*, 183

Wn.2d 578, 584, 355 P.3d 253 (2015), in which the state high court held that the trial

court improperly instructed the jury that a reasonable doubt "is a doubt for which a

reason can be given." Nevertheless, *State v. Kalebaugh* contradicts Garvey's contention.

The *Kalebaugh* court held that the proper instruction would have defined reasonable

doubt as "a doubt for which a reason exists." *State v. Kalebaugh*, 183 Wn.2d at 584.

The State gave a correct definition of reasonable doubt to the jury. The State

defined reasonable doubt as "a doubt for which a reason exists," the exact definition our

high court used in *State v. Kalebaugh*. *State v. Kalebaugh*, 183 Wn.2d at 584. Unlike the

15

improper trial court instruction in *Kalebaugh*, the State here did not indicate to the jury

that it must find a reason for its doubt.

In for a Penny, In for a Pound

Vernal Garvey contends that the prosecutor committed misconduct by misstating

the law on accomplice liability during closing argument.  Garvey challenges the State's

use of the "in for a penny, in for a pound" theory of accomplice liability, which he

maintains Washington courts have rejected.  RP (June 27, 2019) at 654.

RCW 9A.08.020 governs accomplice liability.  The statutory language requires

that the putative accomplice must have acted with knowledge that his or her conduct

would promote or facilitate *the* crime for which he or she is eventually charged.  *State v.*

*Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000).  An individual may only be guilty as

an accomplice when he or she has actual knowledge of the crimes the principal commits.

*State v. Cronin*, 142 Wn.2d at 579.

Vernal Garvey challenges the following remarks from the State's closing

argument:

> But when you break down to the elements of robbery, when the three
> are acting in concert, *in for a penny, in for a pound*, you are responsible for
> what the other person does as long as you're acting in concert.  The three
> were acting in concert all day long and finally stumbled, I would argue, into
> a plan that was successful in at least getting Harrison's card.  It wasn't
> successful in draining his bank account thankfully, but they finally did what
> they had set out to do.

RP (June 27, 2019) at 654-55 (emphasis added).

16

Vernal Garvey relies on *State v. Cronin*, 142 Wn.2d 568 (2000). In one of the

consolidated cases, the prosecutor argued that Timothy Cronin was guilty of premeditated

murder as an accomplice. The prosecutor remarked:

> A person who is an accomplice to a crime is guilty of that crime.
> We've all heard the phrase "in for a penny, in for a pound," "in for a dime,
> in for a dollar." This is the principle, this is the policy underlying
> accomplice-liability.

*State v. Cronin*, 142 Wn.2d at 577. Garvey asserts that the *Cronin* court rejected this

metaphorical description of accomplice liability.

Vernal Garvey misinterprets *State v. Cronin*. The Washington Supreme Court did

not find the prosecutor's use of the phrase "in for a penny, in for a pound" a misstatement

of the law. Rather, the high court reversed Timothy Cronin's conviction because of an

erroneous jury instruction regarding accomplice liability. In Cronin's prosecution, the

jury instruction read:

> A person is an accomplice in the commission of *a* crime if, with
> knowledge that it will promote or facilitate the commission of *a* crime, he
> either:
> (1) solicits, commands, encourages or requests another person to
> commit the crime; or
> (2) aids or agrees to aid another person in committing a crime.

*State v. Cronin*, 142 Wn.2d at 576-77 (emphasis added). The jury instruction incorrectly

inserted the indefinite article "a," rather than the definite article "the."

17

Both parties suggest that the Washington Supreme Court, in *State v. Cronin*, criticized the phrase, "in for a penny, in for a pound." We disagree, although one later decision referred to the adage as "now-discredited argument." *In re Personal Restraint of Wilson*, 169 Wn. App. 379, 392, 279 P.3d 990 (2012). Still, no court has found the axiom to constitute prosecutorial misconduct.

## Cumulative Error

Vernal Garvey asserts that the cumulative effect of the State's multiple improper arguments during closing argument prejudiced him. The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Since we find no error, we do find no cumulative error.

## Ineffective Assistance of Counsel

Vernal Garvey alternatively contends that his trial counsel performed ineffectively when failing to object to the State's improper arguments. Since the prosecuting attorney did not commit misconduct during closing statement, we need not address this challenge.

## STATEMENT OF ADDITIONAL GROUNDS

In a statement of additional grounds (SAG), Vernal Garvey argues that the trial court denied him his federal constitutional right to a grand jury. Garvey asserts that this violation requires this court to reverse all his convictions and order his immediate release. We disagree.

Under the United States Constitution: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." U.S. CONST. amend. V. The United Supreme Court holds that the Fifth Amendment's grand jury provision does not apply to state prosecutions. *Hurtado v. California*, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884); *State v. Ng*, 104 Wn.2d 763, 774, 713 P.2d 63 (1985).

Vernal Garvey contends that *Hurtado v. California* is outdated and erroneous. He highlights that, in the time period when the federal Supreme Court decided *Hurtado*, the Court approved Jim Crow laws in *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), *overruled by Brown v. Board of Education of Topeka*, 347 U.S. 686, 74 S. Ct. 686, 98 L. Ed 873 (1954).. He maintains that *Timbs v. Indiana*, 139 S. Ct. 682, 203 L. Ed. 2d 11 (2019) overrules *Hurtado v. California*. Garvey asserts that the *Timbs* court held that *all* the Bill of Rights guarantees are enforceable against the states.

In *Timbs v. Indiana*, the U.S. Supreme Court stated that, "if a Bill of Rights protection *is incorporated*, there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indian*, 139 S. Ct. at 687 (emphasis added). Garvey interprets *Timbs* too broadly. As held in *Hurtado v. California*, the grand jury provision of the Fifth Amendment is not incorporated through the Fourteenth Amendment.

## CONCLUSION

We affirm Vernal Garvey's convictions.

19

No. 37988-4-III
*State v. Garvey, III*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:


_____
Lawrence-Berrey, J.

_____
Staab, J.