[No. 49843-6-I. Division One. July 28, 2003.]

*In the Matter of the Personal Restraint of* EPHRAIM R. SMITH, *Petitioner.*

*Kathryn A. Miller* and *John Henry Browne*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Ann M. Summers, Deputy*, for respondent.

KENNEDY, J. — Ephraim R. Smith contends in a personal restraint petition that his convictions for kidnapping in the first degree, robbery in the first degree, and attempted robbery in the first degree must be reversed and remanded for a new trial because the accomplice liability instruction given to his jury was erroneous under *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000) and *State v. Cronin*, 142 Wn.2d 568, 14 P.3d 752 (2000). The State concedes that the instruction was incorrect, but argues that Smith's petition is both time-barred and improperly successive, and that, in any event, he cannot establish actual and substantial prejudice because the error was harmless. We hold that the petition is timely and not improperly successive, and that the instruction was erroneous, but that reversal is not required. Smith has not established that the error had any actual substantial influence on the jury's verdict. The State presented overwhelming evidence that Smith was a principal in each of the crimes with which he was charged and, although Smith testified at trial that he was merely present while the crimes took place, wearing as he put it, "mental blinders," he effectively confessed on the witness stand to active participation in several phases of the ongoing kidnappings and robberies with which he was charged. Accordingly, we dismiss the personal restraint petition.

## FACTS

### The State's Evidence

Andrew G., Raechel N., Roy R., and Dawn S. stopped at a 7-Eleven store to refuel Raechel's car, at about 3 A.M. on

September 10, 1995. Raechel and Andrew were outside the vehicle pumping gas when two young men, later identified as Carlos Huereca and Ephraim Smith, emerged from nearby bushes and approached them. According to the testimony of the victims, Smith hit Andrew over the head with a small silver-colored pistol, knocking him to the ground. After ordering Raechel and Andrew back into the car, Huereca got into the back seat, and Smith got into the driver's seat. Speaking to Dawn, Smith said, "You are mine tonight." Smith then pointed the gun toward each of the occupants in turn and both men demanded that the victims hand over their valuables. As the victims began to comply, Smith started the car, gave the gun to Huereca, and drove to Lake Fenwick, which was about 15 minutes away. The defendants continued to demand property from the four victims while en route to and after arriving at Lake Fenwick. Dawn tried to remove a ring she was wearing, but it was too tight and she could not get it off her finger.

Upon arriving at Lake Fenwick, everyone got out of the car and Huereca told the victims, at gunpoint, to take off their clothing. Andrew, Raechel, and Roy began removing their clothing, but Smith told Dawn that she did not have to take off her clothes, and had her join him in the car. Huereca remained outside with the other victims. When they were naked, Huereca ordered them, still at gunpoint, to get into the trunk of the car. Huereca then shut the trunk lid, joined Smith and Dawn in the car, and began rifling through clothing belonging to the naked victims. According to Dawn, both men looked through the car for other items to steal. Huereca asked Smith if he wanted to have sexual intercourse with Dawn, and if so, he wanted to watch. Dawn said that if they were going to rape her they would have to kill her first. Smith told Huereca to leave Dawn alone because she was "his," and told Dawn that he would not let anything happen to her. Dawn was finally able to remove her ring, and handed it to Smith, who gave it back to her, telling her that she could keep it.

Huereca returned to the trunk of the car, opened it, and ordered Raechel to get out. She did so, and Huereca took

her a short distance away and raped her at gunpoint. At Dawn's request, Smith twice left the car, ostensibly to check on Raechel's welfare. When he returned to the car, he told Dawn that Raechel was okay, and that Huereca was just playing with her.

After a while, Huereca returned Raechel to the car and put her back into the trunk. Raechel told Andrew that she had been raped. Shortly thereafter, the trunk was re-opened, and this time both Smith and Huereca were there. Both of them hit Andrew, threatening to kill him, and telling him that he had not given them enough property. Hoping to save his life, Andrew told them that his truck was parked at a particular high school, and that they could have his stereo and speakers that were in the truck. Huereca and Smith decided to go to the truck.

Andrew, Raechel, and Roy were told to get dressed. When they had done so, Raechel and Roy were ordered back into the trunk of the car, and Andrew was placed inside the car in order to give directions to where his truck was parked. The group then drove to the high school. Andrew subsequently testified that Smith again drove the car, but both Dawn and Smith testified that Huereca drove this time. On the way, Huereca gave the gun to Smith, who surreptitiously unloaded the gun by removing the clip, removing the bullets from the clip, and reinserting the clip into the gun. Only Smith and Dawn knew that the gun had been unloaded.

Upon arriving at the high school, Smith gave the gun back to Huereca, and Huereca and Andrew got out of the car and went to the truck. It is undisputed that, this time, Smith drove the car, with Raechel and Roy still locked in the trunk. Smith followed Huereca and Andrew from the high school to a Safeway parking lot. There, Huereca removed the stereo and speakers from Andrew's truck, and he and Andrew got back into Raechel's car. With Smith still driving, the group went to an apartment complex where Huereca left the vehicle, taking the stereo speakers, the gun, and various items of property that belonged to the

victims with him—including Raechel's shoes, a shirt belonging to Roy, and cash belonging to Andrew.

Smith then drove to a gas station, where he hugged Dawn, told her that he was sorry but that this was the way that he made his living, and left the vehicle, carrying Andrew's stereo. Dawn drove to a nearby donut shop, where she and Andrew let Raechel and Roy out of the trunk. The group then drove to a friend's house and called the police.

None of the victims recognized their assailants. The victims gave physical descriptions of the two men to police, and described the clothing they had been wearing. Raechel was taken to Harborview Hospital to be examined for evidence of rape and treated for her injuries received during the rape.

Some of the victims subsequently identified Smith and Huereca from photomontages or a lineup. Huereca was arrested at his apartment. In a consent search of the apartment, police found a small silver-colored handgun, Andrew's stereo speakers, a stolen CD case from another crime that was committed earlier that same night, and items of clothing that matched the description of what the victims told police Huereca had been wearing on the night of the crimes. Smith's fingerprints were found at several places on Raechel's car.

Smith and Huereca were charged with four counts each of first degree kidnapping (for intentional abduction of each of the four victims with the intent to facilitate a felony or flight thereafter), with firearm enhancements; three counts each of first degree robbery (for taking personal property from the persons of or in the presence of Andrew, Raechel, and Roy, against their wills, by the use or threatened use of force, violence or fear of injury, with the intent to commit theft of the property, while armed with or displaying what appeared to be a firearm or other deadly weapon), with firearm enhancements; and one count each of attempted first degree robbery (for attempting to rob Dawn of her ring), with a firearm enhancement. In addition, Huereca

alone was charged with a single count of first degree rape of Raechel, with a firearm enhancement.

The defendants were tried together. At the trial, each of the victims testified to the events on the night in question, as described above. They identified the gun found during the search of Huereca's apartment as the gun or very like the gun used in these crimes, and they identified Smith and Huereca as their assailants.

The victim of a similar crime testified that, on September 3, 1995, Smith and Huereca kidnapped him at gunpoint and drove him in his own vehicle to Lake Fenwick, where they robbed him. They then drove him to the same general area where the victims of the instant crime were released. That victim identified the small silver-colored handgun used in this crime as the same gun that Smith held a week earlier, during his kidnapping and robbery. Smith's fingerprints subsequently were found in this victim's vehicle.

Two other men also testified that, on September 10, 1995, about half an hour before the crimes in this case, they were at another convenience store/gas station when Smith and Huereca approached them and ordered one of them, at gunpoint, to get back into the car. He refused and ran into the convenience store to call 911. Smith and Huereca got into the car with the other man and ordered him to drive away. He refused, even though Smith threatened to shoot him. Smith grabbed a CD case from the vehicle, and he and Huereca fled. That same CD case was found in Huereca's apartment during the search that followed his arrest.

### Smith's Testimony

Although Dawn testified that she had never seen Smith before the night of the kidnappings and robberies, Smith testified that the two had known each other for some time, and had been romantically involved. According to Smith, when he and Huereca happened to come upon Dawn, Raechel, Roy, and Andrew at the 7-Eleven store, Smith was jealous to see Dawn in the company of Roy and Andrew.

According to Smith, nobody hit Andrew at the 7-Eleven. Instead, Dawn and Smith began to argue, and Raechel suggested that they all go for a drive to discuss the matter.

According to Smith, Raechel, not he, drove to Lake Fenwick, and everybody got out of the car. While he was talking to Dawn, he then heard a thump, turned around and saw that Huereca and Andrew were fighting. He ran toward them. Andrew then called him a racially-charged name, so he jumped into the fight and punched Andrew in the face, knocking him to the ground. He then saw that Huereca had drawn a gun. He had not realized that Huereca was armed that night. He pulled Dawn out of the way. Huereca told Dawn and the others to remove their clothing, but Smith told Dawn that she did not have to do that, and took her into the car. He testified that he did not want to be involved in whatever Huereca was doing, and so he put on "mental blinders." Huereca put Andrew, Raechel, and Roy into the trunk of the car, brought their clothing to the back seat of the car, and began searching the clothing for valuables. After Huereca removed Raechel from the trunk of the car and took her away from the vehicle, Dawn twice asked Smith to go check on Raechel's welfare. He pretended to do so, but never actually found them. He just told Dawn, both times, that Raechel was okay.

Dawn removed her ring and tried to give it to Smith, telling him that Huereca needed it more than she did, but he gave the ring back to Dawn. Smith did not explain why Dawn would give him her ring, rather than giving it to Huereca, if he was not a participant in the robberies.

Eventually, Huereca returned with Raechel. He allowed her, Roy, and Andrew to get dressed. He put Raechel and Roy back into the trunk of the car, and brought Andrew to the front passenger seat, telling Smith and Dawn to get into the back seat of the car, and they did so. Huereca got into the driver's seat, and Andrew got into the front passenger's seat. Huereca could not start the car, so he brought Raechel out from the trunk to start it for him. After she started the car, he put her back into the trunk, and drove away from

the lake. On the way, he offered the gun to Smith, who did not want to take it at first, but did take it. Smith secretly unloaded the gun and put it onto the back floorboard of the car while Huereca drove to Thomas Jefferson High School. Smith then handed the unloaded gun to Huereca, and Huereca and Andrew left the car and got into a truck—Smith testified that he did not know at first whose truck it was.

Smith and Dawn got back into the front seats of the car, with Smith in the driver's seat. When Huereca and Andrew drove off in the truck, Smith followed them—with Raechel and Roy still in the trunk of the car. At a Safeway parking lot, Huereca and Andrew returned to the car. Huereca was carrying Andrew's stereo equipment, which he had removed from the truck. Smith then drove to Huereca's apartment complex where Huereca got out of the car, taking the gun and stereo equipment with him. Smith then drove to a gasoline station, parked near some pay telephones, and got out of the car. He did not release Raechel and Roy from the trunk of the car.

According to Smith, Dawn got out of the car and gave him a hug, but he did not apologize to her or tell her how he made his living. He went to his sister's apartment, and went to sleep. He did not call the police, and he never saw Dawn again until she testified at the trial.

According to Smith, he did not take anything from any of the victims. He testified that he was not afraid of Huereca, either before or after he unloaded the gun. He admitted that instead of following Huereca and Andrew from the high school to the Safeway parking lot, he could have driven to some other location, let Raechel and Roy out of the trunk of the car, and called the police, but he did not do so.

Smith's theory at trial was that he was merely present, wearing "mental blinders" as it were, while Huereca alone committed the crimes, that when the victims testified that Smith took an active role in the kidnappings and robberies they were lying, and that all of them, including Dawn, were involved in a conspiracy against him. Huereca did not

testify at the trial. His theory was that he was not even with Smith at the time of the crimes, that Smith was lying when he testified otherwise, and that all of the victims, including Raechel, had simply mistaken him for somebody else.

### The Verdict and Procedural History Thereafter

Both defendants were convicted as charged. Smith was sentenced within the standard range. He appealed his conviction to this court, and we affirmed his conviction in an unpublished opinion filed on April 26, 1999. The Supreme Court denied Smith's petition for discretionary review, and we issued our mandate on November 2, 1999.

On July 12, 2000, Smith filed his first personal restraint petition. We dismissed that petition and the Supreme Court denied discretionary review.

The current personal restraint petition was filed on June 13, 2002. The issue now before us was not raised in Smith's direct appeal, nor was it raised in Smith's first personal restraint petition.

### ANALYSIS

### State's Request to Dismiss the Petition

As a general rule, any petition collaterally attacking a criminal judgment and sentence must be filed within one year of the date the judgment becomes final. RCW 10.73.090(1). A personal restraint petition is one such form of collateral attack. RCW 10.73.090(2). A judgment becomes final on the date that the appellate court issues its mandate disposing of a timely direct appeal from the conviction. RCW 10.73.090(3)(b). Thus, the judgment against Smith became final on November 2, 1999, when this court issued its mandate. Because Smith filed the current personal restraint petition on June 13, 2002, more than two years after the mandate disposing of his direct appeal, his collat-

eral attack is time-barred under the general rule. The State asks us to dismiss the petition for that reason.

■ ■ An exception to the one-year time limit exists, however, if there has been "a significant change in the law" that is "material" to the conviction or sentence. RCW 10.73.100(6). Smith argues that this petition is not time-barred because our Supreme Court's opinions in *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000) and *State v. Cronin*, 142 Wn.2d 568, 14 P.3d 752 (2000), which were published after his conviction became final, and after he filed his first personal restraint petition, represent a significant change in the law of accomplice liability. We agree.

The dissent in *Cronin* expressly noted the new interpretation the Supreme Court was giving to the accomplice liability statute.

> The majority today approaches the interpretation of RCW 9A.08.020(3) and [11 Washington Pattern Jury Instructions: Criminal ( ]WPIC[ )] 10.51 [(2d ed. 1994)] as if our former cases on the issue of accomplice liability never existed. Beginning with *State v. Davis*, 101 Wn.2d 654, 682 P.2d 883 (1984), and leading to *State v. Sweet*, 138 Wn.2d 466, 980 P.2d 1223 (1999), we have held an accomplice, having knowingly agreed to participate in a criminal act, runs the risk of having a confederate exceed the scope of the initial criminal understanding; the accomplice is, nevertheless, culpable for the reasonably foreseeable consequences of that initial criminal understanding.

*Cronin*, 142 Wn.2d at 586-87 (Talmadge, J., dissenting) (footnotes omitted).

In *In re Personal Restraint of Sarausad*, 109 Wn. App. 824, 39 P.3d 308 (2001), this court entertained a personal restraint petition that raised the same issue regarding the scope of accomplice liability that had been rejected in Sarausad's direct appeal some three years earlier. We concluded that fairness required us to readdress the issue in light of the Supreme Court's decisions in *Cronin* and *Roberts* because we had decided the direct appeal based on the same "in for a dime, in for a dollar" misunderstanding of

the Supreme Court's decision in *Davis* that ultimately led to the erroneous accomplice liability instruction that was given to the jury at Smith's trial. *See Sarausad*, 109 Wn. App. at 833-34.

We cannot expect Smith to have understood the limitations of the Supreme Court's decision in *Davis* when we ourselves failed to recognize them until the *Cronin* and *Roberts* decisions were published on December 14, 2000.

We decided Sarausad's direct appeal in 1998. We decided Smith's direct appeal in 1999. Clearly, if Smith had claimed in his direct appeal that the accomplice liability instruction given at his trial was erroneous, which he did not, we would have rejected the contention, based on our reading of *Davis* and its progeny at that time. We conclude that the Supreme Court's clarification of its ruling in *Davis*, as explained in *Roberts* and *Cronin*, was so significant as to amount to a material change in the case law governing accomplice liability. Accordingly, Smith's current personal restraint petition is timely under RCW 10.73.100(6).

■ We also reject the State's argument that Smith's petition is barred because it is his second, rather than his first. RCW 10.73.140 states:

> If a person has previously filed a petition for personal restraint, the court of appeals will not consider the petition unless the person certifies that he or she has not filed a previous petition on similar grounds, and shows good cause why the petitioner did not raise the new grounds in the previous petition.

*See also In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986) ("ground" is defined as a distinct legal basis for granting relief). Smith filed his first petition in July 2000, some five months before the decisions in *Cronin* and *Roberts* came down. As our previous discussion indicates, Smith cannot be faulted for failing to raise the issue before those cases were published on December 14, 2000. Accordingly, Smith has met the statutory requirement to show good cause why the issue was not raised in the previous petition.

## Standard of Review for Harmless Error

The State concedes that the accomplice liability instruction given to the jury in this case contains the "a crime" error identified in *Cronin*. The *Cronin* court held that 11 *Washington Pattern Jury Instructions: Criminal* 10.51 (2d ed. 1994) defining accomplice liability, as revised in 1994, erroneously stated that a person is liable as an accomplice if the person had knowledge that his actions would promote or facilitate commission of "a" crime. After reviewing the instruction and the facts of the case, the court held that the erroneous instruction unconstitutionally relieved the State of the burden of proving the defendant's knowing participation in "the" crime, meaning the charged crime. *Cronin*, 142 Wn.2d at 580-82.

Smith's jury was instructed on accomplice liability as follows:

A person who is an accomplice in the commission of *a* crime is guilty of *that* crime whether present at the scene or not.

A person is an accomplice in the commission of *a* crime if, with knowledge that it will promote or facilitate the commission of *a* crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit *the* crime; or

(2) aids or agrees to aid another person in planning or committing *a* crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of *the* crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

Instruction 65 (emphasis added). The State argues that this error was harmless in the context of this case, and so Smith cannot establish that he was actually and substantially prejudiced, either by a violation of his constitutional rights or by a fundamental error of law, as is required of a personal

restraint petitioner. *See In re Pers. Restraint of Benn,* 134 Wn.2d 868, 884-85, 952 P.2d 116 (1998).

Our state Supreme Court has held that an erroneous jury instruction that omits an element of the offense is subject to harmless error analysis. *State v. Brown,* 147 Wn.2d 330, 340, 58 P.3d 889 (2002) (citing *Neder v. United States,* 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). This is so even in cases where multiple crimes have been charged against multiple defendants as to some of the charges. *Id.* In a direct appeal, such an error will be harmless only if, after thoroughly examining the record as to each defendant, the reviewing court is able to conclude beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.* at 341.

■■ For purposes of a direct appeal, constitutional error gives rise to a presumption of prejudice, and the burden is on the State to show that the error was harmless beyond a reasonable doubt. *Benn,* 134 Wn.2d at 940. A different standard governs review of a collateral attack, however. Here, the burden is on Smith to show that the error worked to his actual and substantial prejudice, even if the error could not have been considered harmless beyond a reasonable doubt on direct review. *In re Pers. Restraint of St. Pierre,* 118 Wn.2d 321, 328, 823 P.2d 492 (1992).

The federal courts apply the same "substantial prejudice" standard to habeas corpus reviews arising from erroneous accomplice liability instructions. In *California v. Roy,* 519 U.S. 2, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996), a defendant sought habeas relief from his California convictions for robbery and first degree murder for aiding and abetting felony murder. At the trial, the jury was instructed in accord with then-prevailing California law that it was permitted to convict as long as it found that Roy, with knowledge of the confederate's unlawful purpose (robbery) had aided, promoted, encouraged, or instigated by act or advice the commission of the confederate's crime. *Roy,* 519 U.S. at 3. After Roy's conviction, the California Supreme Court held that an identical instruction was erroneous

because it failed to require the jury to find that the defendant had the knowledge and intent or purpose of committing, encouraging or facilitating the confederate's crime. *Id.* Roy sought habeas relief from the California Court of Appeals, which denied relief because it found the error to be harmless beyond a reasonable doubt. The California Supreme Court denied review.

Roy then moved to the federal courts. The district court denied relief, reasoning that the error was harmless because no rational juror could conclude that Roy knew his confederate's purpose and helped him without also concluding that Roy intended to help him. *Id.* The Ninth Circuit, applying an incorrect standard of review, reversed Roy's conviction, but the United States Supreme Court vacated that decision and remanded, stating that the standard for determining harmless error on collateral attack is this: "[W]hether the error had [a] substantial and injurious effect or influence in determining the jury's verdict." *Roy*, 519 U.S. at 5. This is a less stringent standard than "harmless beyond a reasonable doubt." Instead, the reviewing court must ask itself whether the court " 'is in grave doubt as to the harmlessness of an error,' " and if it is " 'petitioner must win.' " *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)).

## The Merits of the Petition

Smith and Huereca were each charged with and convicted of four counts of first degree kidnapping, three counts of first degree robbery, and one count of attempted first degree robbery. Huereca was also charged with and convicted of an additional count of first degree rape. Smith was not charged with or convicted of first degree rape, either as a principal or an accomplice. The State never argued that Smith facilitated the rape or that he could be found guilty of any of the crimes with which he was charged based on the rape. Smith's defense counsel explicitly pointed out to the

jury that not only was Smith not charged with facilitating the rape, but also there was no evidence that he did facilitate the rape. Smith does not argue in his petition that the erroneous accomplice liability instruction could have somehow confused the jury into believing that it could convict him of kidnapping and robbery because Huereca committed the rape. Accordingly, we will not further address the rape.

The kidnapping counts were based on the allegation that Smith and Huereca abducted the four victims with intent to facilitate a felony and flight thereafter, contrary to RCW 9A.40.020(1)(b). The jury was instructed that robbery, theft in the first degree, taking a motor vehicle without permission of the owner, assault in the second degree, and rape are all felonies, and each of these crimes was defined for the jury. The jury was also instructed to decide each count against each defendant separately, and that the verdict on any count as to any defendant should not control the verdict on any other count or as to any other defendant. A separate "to convict" instruction naming each of the alleged victims was given as to each count, and as to each defendant. The jury was given separate verdict forms to correspond with these instructions.

As to Smith, the "to convict" instructions for each of the kidnapping, robbery and attempted robbery counts required that in order to convict, the jury must find beyond a reasonable doubt that Smith (not Smith or an accomplice) committed each of the elements of each crime, as to each alleged victim. In addition to the "to convict" instructions for first degree kidnapping, first degree robbery, and first degree attempted robbery, the jury received lesser included offense "to convict" instructions for second degree kidnapping, second degree robbery, and attempted second degree robbery. Although the jury was given a list of other felonies that could support a kidnapping charge, Smith was not charged with those crimes, and the jury received no "to convict" instructions with regard to those crimes.

The prosecutor pointed to evidence at the trial, however, indicating that Smith and Huereca each actively participated in robbery, first degree theft, second degree assault, and taking a motor vehicle without permission of the owner, any of which could be the basis of the first degree kidnapping charge. First, the prosecutor pointed out that Smith hit Andrew alongside the head with the gun at the 7-Eleven, knocking him to the ground, that Smith pointed the gun at each of the victims individually at the outset of the abduction, that Huereca ordered the victims, at gunpoint, to strip naked and get into the trunk of the car, and that Smith and Huereca each hit Andrew in the head with the gun while he was in the trunk, threatening to kill him because he had not given them enough property—constituting multiple second degree assaults with a deadly weapon. The prosecutor pointed out that Smith and Huereca each drove Raechel's car without her permission, and that Huereca drove Andrew's truck without his consent. The prosecutor pointed out that taking personal property of any value from the person of another constitutes first degree theft. And the prosecutor described at length the evidence that each of the defendants actively participated in the robberies of Roy, Raechel, and Andrew, and in the attempted robbery of Dawn. Summing up the kidnapping charges, the prosecutor said: "I think at this time we better well face it, there was [sic] a hell of a lot of felonies committed by both defendants here." Report of Proceedings (Closing Arguments) (Sept. 30, 1999) at 17. Although none of the listed felonies that can serve as the "abduction with intent to facilitate a felony or flight thereafter" element of first degree kidnapping was separately charged, other than robbery (and in Huereca's case, the rape), by showing each defendant's active participation in all of the listed felonies except for the rape, the prosecutor was proving an element of "the" charged crime of kidnapping—not "a" crime within the meaning of the erroneous accomplice liability instruction—and Smith does not argue to the contrary in his personal restraint petition.

With respect to the accomplice liability instruction itself, the prosecutor told the jury during closing argument:

Each defendant is here because they each have individually been charged with the crimes they have been charged with. And when you are deliberating you are going to have to decide the fate of each defendant on each count by looking at their actions and how—whether or not they committed that count or particular crime. That being said, the first instruction I feel is very important, which is the one I call the accomplice instruction. It is number 65. It is very near the end. Now, I just told you that you have to judge each defendant on his own actions. Well, the accomplice instruction kind of muddies that water a little bit. Because if you are an accomplice to a crime here is what happens. A person who is an accomplice to the commission of a crime is guilty of that crime whether present at the scene [or not]. A person is an accomplice when he aids or agrees to aid another person in committing the crime. . . . What does that mean? It means that if you are helping out another in the commission of a crime then you are guilty of that crime as if you were the sole person who committed that crime. So, for example, when one defendant commands the victim to come out with their property, when the other defendant is holding a gun to all of them, they are both accomplices to the other person's commission of those crimes. For example, when one defendant orders the victims into a car while the other defendant gets behind the wheel where they rob them, and then this defendant drives to another location where other crimes are committed upon them, they are both accomplices to the other's commission of those crimes.

9 Report of Proceedings at 7-9. Thus, although the accomplice liability jury instruction erroneously used the "a" crime language, the prosecutor referred only to "the" crime, or "that" crime, referring in each instance to the charged crimes of kidnapping and robbery.

In a direct appeal, *State v. Brown* would require that we look at the evidence as a whole and ask ourselves, with respect to each of Smith's convictions, whether it is reasonably possible that the "a crime"/"the crime" error contained in the accomplice liability instruction could have contrib-

uted to the verdict against Smith. Here, we must look at the same evidence and ask ourselves whether we have any grave doubts about the harmlessness of the error.

Looking first at the State's case, each of the kidnapping, robbery and attempted robbery victims testified that Smith initially had the gun, that Smith hit Andrew with the gun while at the 7-Eleven gas pumps, that Smith got into the driver's seat of Raechel's car and pointed the gun at each of them while demanding, together with Huereca, that they turn over all of their valuables. The victims testified that they immediately began complying with that demand, or in Dawn's case attempting to immediately comply by attempting to remove her ring. All of the victims testified that Smith handed the gun to Huereca, who was in the back seat of the car, and drove to Lake Fenwick. Once at the lake, the victims were ordered out of the car and told to strip, and three of them were locked naked in the trunk of the car while Huereca rifled through their clothing, and while both Huereca and Smith searched the car for other valuables.

While Andrew was still in the trunk of the car, both Smith and Huereca appeared, and, in turn, struck him with the gun, telling him that he had not given them enough property—and so he volunteered that he had stereo equipment in his truck, which was parked at a high school, and Smith and Huereca agreed that they would go to the truck. Although the evidence is disputed as to whether Smith drove the car from the lake to the high school parking lot, everyone, including Smith, agreed that Smith drove the car from the high school to the Safeway parking lot, with Raechel and Roy still locked in the trunk of the car, and that after Huereca and Andrew returned to the car with Andrew's stereo equipment, Smith drove Huereca to his getaway point, and then drove the car to his own getaway point.

And the jury also heard evidence that Smith actively participated with Huereca in the kidnapping and robbery of a different victim, who was also taken to Lake Fenwick a week earlier, and in the attempted kidnapping and robbery

of two other men about a half hour earlier on the same evening as the crimes in this case were committed.

Certainly, if the jury believed the State's evidence and only so much of Smith's testimony as was corroborated by Dawn, Smith was convicted as a principal on all counts with which he was charged. *Cf. State v. Borrero*, 147 Wn.2d 353, 365, 58 P.3d 245 (2002) (if the jury disbelieved Borrero's defense that he was not present at the time of the crimes, the testimony of the State's witnesses established that he was a principal in the charged crimes, and the error in the accomplice liability instruction was immaterial); *see also Brown*, 147 Wn.2d at 343 (defendant Baker was charged with four crimes, and in three of them the evidence establishes that he acted as a principal; as to those counts, the error in the accomplice liability instruction was harmless beyond a reasonable doubt).

But given Smith's testimony at trial, we must also consider whether, if the jury believed all or part of Smith's testimony, the error in the accomplice liability instruction could have had an actual substantial impact on the verdict.

We first address Smith's contention that because the State's evidence was not entirely uncontroverted, we must conclude as a matter of law that the error could not have been harmless under any standard. Smith points to the following language in *Brown*, 147 Wn.2d at 341:

> In order to conduct its analysis, the *Neder* court set forth the following test for determining whether a constitutional error is harmless: "[W]hether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). *When applied to an element omitted from, or misstated in, a jury instruction, the error is harmless if that element is supported by uncontroverted evidence. Neder*, 527 U.S. at 18.

(Emphasis added.) Smith would have us read the emphasized language to mean that it is *only* where the evidence is uncontroverted that such an error can be deemed harmless. We disagree. Our Supreme Court's decision in *Borrero*

belies that proposed construction of the statement in *Brown*. In *Borrero* the evidence was not uncontroverted, yet the erroneous accomplice liability instruction was deemed to be harmless beyond a reasonable doubt. Borrero's defense was that he was not present and was not involved in the kidnapping and attempted murder of the victim in that case. *Borrero*, 147 Wn.2d at 365. The court had three bases for its ultimate ruling. First, the jury asked for and was given a clarifying instruction to the effect that the accomplice liability instruction—which was identical to the one given at Smith's trial and therefore erroneous—applied to both of the charged counts and not to just one of them. Second, if the jury believed that Borrero was present as testified to by the State's primary witnesses, that testimony provided a sufficiency of evidence to find Borrero liable as a principal for both charged crimes. And third, if the jury had believed Borrero's defense that he was not present, it would have acquitted him because there was no allegation that Borrero was assisting from afar—so that in either instance, the use of the improper article in the accomplice liability instruction would be immaterial. *Id*.

Certainly, uncontroverted evidence is *one* means by which a reviewing court can determine an instructional error to be harmless, but it is not the *only* means, and our Supreme Court did not rule otherwise in *Brown*. Indeed, it is the rare criminal trial in which the State's key evidence is *not* controverted in some way, though not always by way of testimony of the defendant.

The statement upon which Smith relies derives from *Neder*, 527 U.S. at 18, a case in which the defendant was charged with violating a number of federal criminal statutes penalizing fraud. As to the tax fraud charge, the federal district court, relying upon precedent that was subsequently overruled, declined to instruct the jury on the issue of materiality because materiality was deemed to be an issue for the court to decide as a matter of law. *Neder*, 527 U.S. at 6. Thus, when the jury was instructed on the elements of tax fraud, the element of materiality was omitted.

While Neder's appeal was pending, the precedent upon which the trial court had relied was overturned. The Eleventh Circuit agreed that the instruction was erroneous, but found the error to be harmless. The question for the United States Supreme Court was whether such an error could ever be harmless. The court ruled that such an error can be harmless, and that it was harmless beyond a reasonable doubt in Neder's case. The court reasoned as follows: The government's position was that Neder understated his income for purposes of his federal income tax returns by some $5 million. At trial, Neder did not contend that the amount was not material—nor could he have since the failure to report that amount of income would incontrovertibly be material to one's income tax liability. Neder's position at trial was that the $5 million he failed to report was not income, rather it was loan proceeds. *Neder*, 527 U.S. at 16-17. The Court said:

> In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.
>
> Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.

*Neder*, 527 U.S. at 19.

Smith certainly contested the extent of his own involvement in the ongoing kidnappings and robberies, but he did not present evidence sufficient to support a contrary finding as to his involvement—although he may have believed that he was doing so. By Smith's version of the events that night, there was no abduction of the victims from the 7-Eleven at all, and there was no kidnapping or robbery until Huereca

unexpectedly pulled a gun at Lake Fenwick. By Smith's version, Huereca abducted Andrew, Roy, and Raechel—and would have abducted Dawn as well if Smith had not intervened—by locking them in the trunk of the car while Huereca, alone, robbed them—and would have robbed Dawn of her ring, as well, if Smith had not intervened. But even if the jury believed Smith's version, Dawn was no less restrained because she was not required to strip and get into the trunk of the car. The jury was instructed that restraint means to restrict another person's movements without her consent, and that restraint is without consent if it is accomplished by physical force, intimidation or deception. Instruction 23. Even by Smith's version, Dawn was restrained from the time that Huereca ordered her friends into the trunk of the car until the time that Smith took his own leave, after all of the events of that night—and this is equally true whether or not Smith and Dawn were strangers to one another.

Smith went on to admit that, at the high school, he, Smith, took over the wheel of Raechel's car and followed Huereca and Andrew from the high school to the Safeway parking lot—with Roy and Raechel still locked in the trunk of the car, and Dawn and Andrew most certainly not free to leave. Smith admitted that he could have failed to follow the truck, and instead could have driven to another location and freed Roy, Raechel, and Dawn, but he did not do that. Instead, he followed Huereca and watched as he removed Andrew's stereo equipment and returned with it to Raechel's car. Moreover, Smith admitted that he drove Huereca home, and watched as Huereca left the group, taking the gun and the victims' belongings with him. Even then, Smith did not free the victims. Instead, he drove to another location, near his sister's apartment, and parked Raechel's car by some pay telephones, but did not avail himself of the opportunity to call the police. Smith left the group there, without even freeing Roy and Raechel from the trunk of the car. By Smith's testimony, he justified this conduct in his own mind by stating that he was wearing

"mental blinders," but any rational jury, even if it believed Smith's testimony, would view this conduct as knowingly facilitating the ongoing kidnappings and robberies that Smith knew Huereca had committed *and was still committing* that night—all of the jointly charged crimes and not just some of them.

Smith cannot parse the crimes that took place that night, for they were ongoing and interrelated—the kidnappings were to facilitate the robberies and the flight thereafter, and both the kidnappings and robberies took place over a significant period of time and distance. The robberies were not completed at least until Huereca walked away carrying the victims' belongings—and not until Smith walked away carrying Andrew's stereo, if the jury believed the State's evidence in that regard. And since Smith kept the victims restrained until he, too, was ready to leave, the kidnappings were ongoing until then. The jury likely took that into account while deliberating on Smith's liability for the crimes with which he was charged, whether as a principal or as an accomplice.

The jury was instructed with respect to the kidnapping charges that it could convict Smith of first degree kidnapping if he intentionally abducted the victims with the intent to facilitate the commission of a felony *or flight thereafter*. And the jury was also instructed that abduction means to *restrain or hold* a person in a place where that person is not likely to be found. Smith effectively confessed to knowingly holding all of the victims in Raechel's car—some in the trunk and some inside the car itself—while Huereca continued with the robberies and made his getaway, and until Smith himself took his leave of the victims.

The robbery instructions told the jury that the elements of first degree robbery are (1) the unlawful taking of property from the person or presence of another, (2) with the intent to commit theft of the property, (3) where the taking is against the person's will by the use or threatened use of immediate force, violence or fear of injury to that person or another, (4) where the force or fear is used to

obtain or retain possession of the property or to prevent or overcome resistance to the taking or to prevent knowledge of the taking, and (5) where in the commission of these acts or in immediate flight therefrom the defendant *is armed with a deadly weapon or displayed what appeared to be a firearm or other deadly weapon. E.g.,* Instruction 31. By his own testimony, Smith knew that Huereca had done all of these things and was still doing them, right up to the point that Huereca made his escape. And by his own testimony, Smith helped Huereca complete these acts by acting as the wheelman during a substantial part of the course of events, of his own volition and not out of fear of Huereca.

The accomplice liability instruction was faulty. But we harbor no grave doubts as to the harmlessness of that error in this particular case. Smith has failed to meet the burden required of a personal restraint petitioner to show actual and substantial damage to him arising from the error. Accordingly, we dismiss the personal restraint petition.

BECKER, C.J., and APPELWICK, J., concur.

Reconsideration denied November 18, 2003.