IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32247-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN C. JACKSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — John Jackson appeals his convictions of second degree possession of stolen property and first degree trafficking in stolen property, arguing that (1) the evidence did not support the essential element of second degree possession of stolen property that the property possessed have a value of more than $750 (but not more than $5,000), (2) the trial court gave an erroneous accomplice liability instruction suggesting that liability could arise if Mr. Jackson facilitated "a" crime rather than "the" crime, and (3) his sentence failed to take into account a merger of the possession and trafficking convictions.

The State concedes that the accomplice liability instruction was flawed but argues that the error was harmless. In light of Mr. Jackson's possible knowledge of or participation in an uncharged burglary and theft that factored into the evidence and the State's closing argument, we disagree, reverse the convictions, and remand for a new trial.

Because Mr. Jackson's argument of evidence insufficiency would, if meritorious, entitle him to dismissal of the possession of stolen property conviction with prejudice, we review that assignment of error and find the evidence sufficient.

We reverse and remand for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL BACKGROUND

Employees arrived at A & A Auto Wrecking (A&A) on Monday morning, June 18, 2012, to find locks to several of A&A's buildings and storage sheds had been cut. A&A is a licensed salvage yard in Ellensburg, and dozens of catalytic converters, radiators, and tire rims had been stolen.

Washington scrap metal businesses are regulated by chapter 19.290 RCW, "to the end that traffic in stolen private metal property or nonferrous metal property may be prevented, and irresponsible, unreliable, or dishonest persons may be prevented from engaging in the business of processing, recycling, or supplying scrap metal in [Washington] state." RCW 19.290.240. Several practices required by state laws and

regulations led to the eventual apprehension of John Jackson for possessing and trafficking in the used parts stolen from A&A.

Because scrap metal businesses are required to keep track of vehicles, parts, and customers, it is A&A's practice upon dismantling a car to mark each of its parts with a number and A&A's name or other identifier using a red paint marker. Core (used part) buyers from A&A likewise need to be able to trace where the parts came from. As soon as A&A employees learned of the break-in, the office manager began calling around to its core buyers, and was able to locate some of the stolen parts at Calbag Metals, a recycling yard in Tacoma.

It turned out that on Saturday morning, June 16, Mr. Jackson and a man named Eugene Swanson sold several items of the type stolen from A&A to Calbag. The Calbag employee who received the parts, Umberto Munez, noticed that they had red markings on them, thought that was suspicious and told Mr. Swanson, "Eugene, those don't look right," to which Mr. Swanson responded that he did not steal from people. Report of Procedings (RP) at 103.

Under Washington law, Calbag would have been required to make delayed payment for the parts to Mr. Swanson, by a nontransferable check mailed to a street address. *See, e.g.*, RCW 19.290.030. But because Mr. Swanson had a commercial account with Calbag, he was paid cash without being subjected to a waiting period. A

3

receipt from Calbag showed that at 8:42 a.m., Mr. Swanson received a payment of $473 in cash for the parts.

A&A was broken into again in October 2012, sometime after the wrecking yard closed on the 29th and before it opened the following morning. More catalytic converters, radiators, and rims were stolen, as well as a number of tools. Police were again unable to identify a suspect who committed the burglary, but determined that on October 30, Mr. Swanson presented radiators, car rims, and one catalytic converter for sale to Calbag, for which he was paid $551.51.

After Mr. Swanson was identified as the seller of parts stolen from A&A, he admitted to police that he had received a call from Mr. Jackson early on the Saturday morning of June 16, 2012, asking to meet him at Calbag so that Mr. Jackson could sell used parts, including catalytic converters, radiators, and tire rims, using Mr. Swanson's commercial account. In exchange, Mr. Jackson agreed to pay Mr. Swanson 10 percent of the cash received for the items.

Mr. Swanson also admitted to police that Mr. Jackson called him several times over the following months with additional items he wanted to sell to Calbag, although Mr. Swanson could not recall precisely how many. He recalled selling parts for Mr. Jackson on October 30, and that the Calbag employee handling the purchase from Mr. Swanson told him that the items he was selling resembled parts he had received a call about, and he was going to flag them.

4

Mr. Swanson agreed to testify against Mr. Jackson in exchange for a charge limited to second degree trafficking in stolen property, to which Mr. Swanson pleaded guilty. Mr. Jackson was charged as a principal or accomplice with first degree trafficking in stolen property and second degree possession of stolen property. He was also charged with the lesser included offenses of second degree trafficking in stolen property and third degree possession of stolen property. The charging document included both the June and the October transactions with Calbag.

At Mr. Jackson's trial, the State presented evidence that, while the value of the parts stolen from A&A varies depending on the value of metals, the total value of the items stolen from A&A on the night of June 15 or early morning of June 16 was several thousand dollars. The owner of A&A, Randy Heistand, estimated that catalytic converters can be worth anywhere between $50 and $300 or more apiece, and that the value of radiators ranges from $5 to $35.

Mr. Swanson testified to his involvement. In his direct examination, he testified that when the Calbag employee stated he was flagging the property presented on October 30, Mr. Swanson had asked Mr. Jackson whether there was a problem, and Mr. Jackson assured him that there was not. But on cross-examination, he corrected himself and testified that he did not believe Mr. Jackson was with him when he made the sale on October 30.

5

At the conclusion of the evidence, the jury was instructed on the crimes of first and second degree trafficking in stolen property for each of the June and the October charging dates, on first degree possession of stolen property based on the June transaction, and on third degree possession of stolen property based on the October transaction. It was also instructed on the law of accomplice liability with a jury instruction that strayed from the Washington pattern jury instruction by referring twice to the State's burden of proving that the defendant facilitated or aided in the commission of "a" crime rather than "the" crime.

The jury found Mr. Jackson guilty of first degree trafficking in stolen property and second degree possession of stolen property on the June charging date. It found him not guilty of the crimes alleged to have occurred in October. Mr. Jackson appeals.

## ANALYSIS

Mr. Jackson contends on appeal that (1) the evidence was insufficient to support the property value element of the crime of second degree possession of stolen property, (2) the trial court gave an erroneous instruction on accomplice liability, and (3) his second degree possession of stolen property and first degree trafficking in stolen property convictions should have merged. The first two assignments of error are dispositive. We address them in turn.

*I. Evidence sufficiency*

6

A person is guilty of possessing stolen property in the second degree if he possesses stolen property which exceeds $750 in value but does not exceed $5,000 in value. RCW 9A.56.160(1)(a). Mr. Jackson first contends that the State failed to present sufficient evidence to establish that the value of the items he possessed between June 15 and June 18, 2012, exceeded $750. He contends that he and Mr. Swanson received a total of only $473 for the parts he sold to Calbag on June 16, which was established to be the market value at the time. He emphasizes that there was no evidence he had any involvement in the burglary and theft at A&A, pointing to a statement by the prosecutor during closing argument that the State did not know whether Mr. Jackson was personally involved in taking the items from the wrecking yard. ("[Do] we know whether he personally was, you know, climbing through the fence and carrying stuff? No. We didn't charge him with burglary.") RP at 225. He points to the absence of any direct evidence that he ever possessed stolen property aside from the items he brought in to Calbag in June.

In deciding a defendant's challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

7

Circumstantial evidence is considered just as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

"Value" for purposes of RCW 9A.56.010(21) is "the market value of the property or services at the time and in the approximate area of the criminal act." Under RCW 9A.56.140(1), "[p]ossessing stolen property" means "knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." To support a conviction under this statute, therefore, the State must prove "(1) actual or constructive possession of the stolen property with (2) actual or constructive knowledge that the property is stolen." *State v. Summers*, 45 Wn. App. 761, 763, 728 P.2d 613 (1986).

The State presented evidence that the total value of property stolen from A&A in June 2012 was considerably greater than $750. It presented evidence that the stolen property included between 80 to 100 catalytic converters, a similar number of radiators, and 125 tire rims. Randy Heistand, the owner of A&A, testified that catalytic converters have platinum in them, and can be worth anywhere between $50 and $300 or more apiece. He stated that radiator prices also vary, ranging between $5 to $8 for the aluminum ones and between $15 and $35 for the copper ones. Although Mr. Heistand

8

could not say exactly what proportion of the radiators stolen were copper, he testified that

all of the copper ones were missing.[1]

It is the total value of the property that the jury determined Mr. Jackson had in his

control during the charging period (June 15 to June 18, 2012) that dictates whether the

---

[1] There was no testimony regarding the value of the tire rims.

$750 value threshold for second degree possession of stolen property was proved, not the amount of cash he received for the parts he sold to Calbag during the June 16 transaction. *Cf. State v. Hassan*, 184 Wn. App. 140, 145, 336 P.3d 99 (2014) (the "value" of property stolen for purposes of proving second degree theft is the value of property under the defendant's control at the relevant time rather than the value reduced to his personal use at that time). The State presented circumstantial evidence from which the jury could reasonably infer that Mr. Jackson had control over more of the property stolen from A&A than just the parts he sold to Calbag for cash the morning after the break-in.

The State's evidence established that Mr. Jackson had possession of parts stolen from A&A within a matter of hours after a nighttime burglary. The break-in occurred sometime after 5:00 p.m. on Friday, June 15. Mr. Swanson testified that Mr. Jackson called him early the next morning to ask him to meet him at Calbag and act as a commercial seller of the parts. The Calbag receipt shows that Mr. Swanson received payment for the parts at 8:42 a.m. Because the parts were transported from A&A's wrecking yard in Ellensburg, to Calbag's recycling facility in Tacoma within a matter of hours after they were stolen, the jury could infer that Mr. Jackson had a close connection with the burglary and theft, even if the State did not attempt to prove that he committed them. Mr. Heistand also testified that Mr. Jackson had been to A&A before, and was therefore familiar with the wrecking yard.

10

The jury was entitled to consider the evidence that Mr. Jackson had similar parts that he continued to sell to Calbag with Mr. Swanson's assistance after June 16, which could have been additional stolen property possessed by Mr. Jackson in June. Mr. Swanson testified that he brought catalytic converters, radiators, and rims to Calbag for Mr. Jackson "quite a few times" between June and October. RP at 142. One of Calbag's employees recalled seeing Mr. Jackson and Mr. Swanson selling parts on three or four separate occasions. From this evidence, the jury could reasonably have inferred that Mr. Jackson, acting as either a principal or an accomplice, had actual or constructive possession of more, if not all, of the parts stolen from A&A during the June break-in, not just those sold to Calbag immediately after the burglary.

The prosecutor explained to the jury in closing argument why the State contended that its evidence of value was sufficient to support second degree possession of stolen property:

> [I]t's very clear that the people who were stealing those items who were possessing those items had much more than $750 worth of them. It's not reasonable to think that separate burglaries happened, you know, over the course of time at [A&A] and that Mr. Jackson only ended up with $473 worth and other people totally unrelated to him and unknown to him stole the others. Now what happens if it took two or [three] people to [carry] that stuff out and they split all this stuff up and Mr. Jackson took his part or some of his part to be sold at Calbag[? Y]ou still are to find Mr. Jackson an accomplice for the possession of stolen property of all of it. So that's why the State is returning to a higher degree, Stolen Property Second Degree because he is still an accomplice.

RP at 236.

Viewing the evidence in the light most favorable to the State, a rational jury could have found beyond a reasonable doubt that as a principal or accomplice, Mr. Jackson possessed stolen property with a value exceeding $750.

## II. *Accomplice liability instruction*

Mr. Jackson next contends that his convictions must be reversed because the accomplice liability instruction provided to the jury was improper. The accomplice liability statute provides, in relevant part:

> (2) A person is legally accountable for the conduct of another person when:
> (a) Acting with the kind of culpability that is sufficient for the commission of the crime, he or she causes an innocent or irresponsible person to engage in such conduct; or
> (b) He or she is made accountable for the conduct of such other person by this title or by the law defining the crime; or
> (c) He or she is an accomplice of such other person in the commission of *the crime*.
> (3) A person is an accomplice of another person in the commission of a crime if:
> (a) With knowledge that it will promote or facilitate the commission of *the crime*, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or
> (ii) Aids or agrees to aid such other person in planning or committing it; or
> (b) His or her conduct is expressly declared by law to establish his or her complicity.

RCW 9A.08.020 (emphasis added). The accomplice liability instruction given in Mr. Jackson's trial, by contrast, referred to "a" crime, rather than "the" crime, stating in part:

12

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *a crime*, he or she either:
(1)     solicits, commands, encourages, or requests another person to commit the crime; or
(2)     aids or agrees to aid another person in planning or committing *a crime*.

Clerk's Paper's at 23 (Instruction 6) (emphasis added). While the remainder of the instruction properly referred to "the crime," the language italicized above departs from both the language of the statute and the pattern accomplice liability instruction. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL §10.51, at 217 (3d ed. 2008).

Our Supreme Court has held that a trial court errs "by giving the jury an accomplice liability jury instruction that refers to the defendant's knowledge of '*a* crime,' rather than '*the* crime.'" *State v. Carter*, 154 Wn.2d 71, 76, 109 P.3d 823 (2005) (citing *State v. Cronin*, 142 Wn.2d 568, 578-80, 14 P.3d 752 (2000); *State v. Roberts*, 142 Wn.2d 471, 510-13, 14 P.3d 713 (2000)). As the court explained in *State v. Brown*, 147 Wn.2d 330, 338, 58 P.3d 889 (2002),

It is a misstatement of the law to instruct a jury that a person is an accomplice if he or she acts with knowledge that his or her actions will promote *any* crime. . . . [F]or accomplice liability to attach, a defendant must not merely aid in any crime, but must knowingly aid in the commission of the specific crime charged.

*See also Cronin*, 142 Wn.2d at 579.

13

The State concedes the flaw in the court's accomplice liability instruction. Br. of Resp't at 18-19. But it argues that reversal is not required because the error was harmless. "An erroneous instruction is harmless if, from the record in a given case, it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Brown*, 147 Wn.2d at 332; *State v. Moran*, 119 Wn. App. 197, 210, 81 P.3d 122 (2003) (the giving of the erroneous accomplice liability instruction does not require reversal if it is harmless error). "When applied to an element omitted from, or misstated in, a jury instruction, the error is harmless if that element is supported by uncontroverted evidence." *Brown*, 147 Wn.2d at 341. "Whether a flawed jury instruction is harmless error depends on the facts of a particular case." *Carter*, 154 Wn.2d at 81.

Where a defendant is faced with multiple charges, the error in the accomplice liability instruction is not harmless and requires reversal "if the evidence pertaining to one or more of the charges shows no direct participation by the defendant as a principal and the jury may have found the defendant guilty as an accomplice based on his involvement in some crime other than the specific crime charged." *State v. Stovall*, 115 Wn. App. 650, 656-57, 63 P.3d 192 (2003). On the other hand, if the evidence shows that the defendant "acted as a principal in any of the crimes charged, the difference between 'a crime' and 'the crime' in the accomplice instruction is harmless with respect to those charges." *Id.* at 656 (quoting *Brown*, 147 Wn.2d at 341-42).

14

Reversal is also appropriate "'if evidence of an uncharged crime is before the jury and the State argues that the defendant's participation in "any" crime triggered liability for the specific crime charged.'" *Carter*, 154 Wn.2d at 82 (quoting *Stovall*, 115 Wn. App. at 657). In contrast, "where the prosecution neither presents evidence of uncharged crimes nor argues that the jury may base accomplice liability on the defendant's knowledge of any crime other than the one charged, the erroneous accomplice instruction may be harmless." *Carter*, 154 Wn.2d at 82.

The State contends that the error in giving the instruction was harmless in this case for both reasons. It reasonably argues that the evidence presented to the jury supported a finding that Mr. Jackson acted as a principal with respect to both the possession and trafficking charged for the period June 15-18, 2012, rather than as an accomplice. But its argument that no evidence of other, uncharged crimes was presented to the jury nor argued by the State is belied by the record, including the closing argument cited above, in which the prosecutor placed the prospect of Mr. Jackson's involvement in the burglary or theft before the jury.

Given evidence and argument concerning the uncharged burglary and theft, the jury could have applied the court's flawed accomplice instruction to find that Mr. Jackson was an accomplice in committing the crimes of possession and trafficking in June 2012 because, with knowledge that it would promote or facilitate the commission of a burglary or theft, he solicited, commanded, encouraged, or requested another person to commit

15

No. 32247-5-III
*State v. Jackson*

one of those crimes; or that he aided or agreed to aid another person in planning or committing the burglary or theft. We cannot say beyond a reasonable doubt that the flawed instruction did not contribute to the verdict.

As a result, the convictions must be reversed and the case remanded for a new trial. We do not reach the merger issue, which may not arise on retrial. If Mr. Jackson is again convicted of both possession of stolen property and trafficking, he may raise the merger argument following the verdict.

We reverse and remand for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey, J.

16